**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Fred F. SOLOMON, Jr.,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George G. NICOLADZE,
Defendant-Appellant.**

**Nos. 86–1155, 86–1162.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1987.

Decided Aug. 18, 1987.

As Amended on Denial of Rehearing and
Rehearing En Banc Nov. 3, 1987.

Deborah Dawson, Washington, D.C., for plaintiff-appellee.

J. Frank McCabe and Stephen Kaus, San Francisco, Cal., for defendants-appellants.

Before GOODWIN, WALLACE and BOOCHEVER, Circuit Judges.

GOODWIN, Circuit Judge:

A jury convicted George G. Nicoladze and Fred F. Solomon, Jr. of (1) conspiracy to defraud the United States, 18 U.S.C. § 371; (2) tax evasion, 26 U.S.C. § 7201; (3) making and subscribing false returns, 26 U.S.C. § 7206(1), and aiding and abetting the same, 18 U.S.C. § 2; and (4) aiding and abetting the preparation and presentation of false returns, 26 U.S.C. § 7206(2). Both defendants allege constitutional, evidentiary, and other errors. None justifies reversal. We affirm as to all matters except for Nicoladze's sentence, which must be vacated and a new sentence imposed.

Solomon and Nicoladze and others not involved in this appeal worked together to establish numerous limited partnerships

created for the dual purposes of developing patents and creating valuable tax shelter deductions. Solomon acted as president of the master partnership entity responsible for establishing the limited partnerships. Nicoladze acted as a consultant to Solomon and as the tax advisor to all the limited partnership entities.

The limited partnerships were designed to give rise to large annual tax deductions for investors. In the majority of cases, a patent was purchased from an inventor for $3,000 in cash and a $2,000,000 nonrecourse note against the limited partnership formed for development of the patent. With such a substantial cost basis, the partnerships were able to offer significant paper losses to individuals desiring "tax shelters" to apply against other sources of income. After purchasing limited partner shares, investors were allocated a portion of the annual losses suffered by the limited partnerships and could deduct those losses on their personal tax returns.

It is not disputed that bona fide patent development limited partnerships backed by nonrecourse notes could support legal tax deductions at the time that Nicoladze and Solomon assisted in the creation of the limited partnerships covered by the indictment. However, the government set forth three types of activities undertaken by the defendants which, if proved, could support criminal convictions. First, in connection with the establishment of the limited partnerships, defendants allegedly purchased existing patents at fraudulently inflated values with no genuine patent development purpose. Second, in anticipation of imminent changes in the tax code which took effect on January 1, 1977, defendants allegedly encouraged their agents (1) to enter into unenforceable oral contracts for the purchase of patents and (2) to backdate to 1976 purchase dates for patents actually purchased in 1977. Third, in order to make the limited partnership shares even more attractive to investors, defendants allegedly backdated documents establishing purchase dates of limited partnership shares in order to extend to share purchasers unwarranted depreciation deductions.

## I. Jury Instructions

A defendant is entitled to a jury instruction on a theory of defense if the theory has a basis in law and in the record. *United States v. Hayes*, 794 F.2d 1348, 1350–51 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *United States v. Escobar de Bright*, 742 F.2d 1196, 1198 (9th Cir.1984). The adequacy of any one jury instruction and the jury instructions as a whole, however, is determined by examining the instructions in their entirety. *United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975); *United States v. Wellington*, 754 F.2d 1457, 1463 (9th Cir.), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

A defendant is not entitled to any particular form of an instruction so long as the instructions given fairly and adequately cover the defendant's theories of defense. *United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir.1985); *United States v. Little*, 753 F.2d 1420, 1432 (9th Cir.1984); *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). The district court has broad discretion in formulating the precise language of jury instructions and " '[i]mperfectly formulated jury instructions will serve as a basis for overturning a conviction only upon a showing of abuse of discretion.' " *Hayes*, 794 F.2d at 1351, quoting *Wellington*, 754 F.2d at 1463.

Supplemental instructions which are given by a trial court in response to jury inquiries are held to a similar standard. Although the trial court is obliged to "eliminate confusion when a jury asks for clarification of a particular issue," the "necessity, extent and character" of supplemental instructions, lies within the discretion of the trial court. *Hayes*, 794 F.2d at 1352.

### A. *Oral Contracts*

The district court instructed the jury that patents could be assigned only in writing. This instruction arguably foreclosed appellants' contention that they had entered or

thought that they had entered into valid patent purchase agreements prior to January 1, 1977. Appellants raise two criticisms of the instruction. First, they contend that the court should have instructed the jury that the patent purchase agreements in issue did not have to be in writing to be valid. Second, they contend that the jury should have been instructed that a good faith belief as to (1) the validity of oral agreements, or (2) the validity of certain boilerplate patent purchase agreements Solomon unilaterally signed in December 1976 would negate the "specific intent" or "willfulness" element of 26 U.S.C. §§ 7206(1) and (2).[1]

■ The first contention, that the oral agreements for the assignment of patents allegedly entered into in 1976 were valid is unpersuasive. Some evidence was presented at trial to suggest that appellants' agent, Robert Winkler, may have obtained oral assurances of varying degrees of finality from inventors, prior to 1977, for the purchase of patents they owned. This evidence was not uncontradicted, however, and in the end the trial court determined, as a matter of law, that a valid assignment of a patent to become operational as limited partnership property required a writing. The court stated: "in the context of an assignment of a patent, they can agree verbally until the cows come home, and that patent isn't assigned until there's a writing." As a consequence, the jury was instructed that only written agreements to assign patent rights are valid. The district court was correct on the law.

■ A patent is a creature of federal statute and may be transferred only according to the terms of the patent statutes. The rules governing the transfer and assignment of patent rights clearly envision a scheme of written assignment by providing that patents "shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. Indeed, the necessity of a writing, like the necessity of an automobile certifi-

cate or a deed, to effect a valid transfer of a patent right has long been a matter of hornbook law. One authoritative treatise describes the state of the law as follows:

> An assignment of a patent must be in writing to fulfill the requirements of the federal statute, and though no particular form of words is required, the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent; it must express intention to transfer ownership.

5 *Lipscomb's Walker on Patents*, Title § 19:7 (3d ed. 1986).

■ Moreover, whether it may be possible to enter into an enforceable oral contract to assign a patent—assuming proper delivery and the existence of adequate consideration—is not relevant here because such an agreement would not suffice for determining tax consequences when a patent had been purchased by one of the appellants' limited partnerships. A contract to assign a patent is legally distinguishable from an assignment of a patent, and valid assignments are a prerequisite to the taking of patent tax shelter depreciation deductions. *See Treas. Reg.* § 1.167(a)–6 (1987) ("patentee" entitled to depreciate cost of patent). *See also Sarkes Tarzian, Inc. v. United States*, 159 F.Supp. 253, 256 (D.Ind.1958) (patent application, although a form of property, is only an inchoate patent right, maturing into a depreciable patent asset only when patent issues); *Fed. Tax Guide Rep.* (CCH) ¶ 1723.20 (1987) (ownership of patent asset necessary predicate to patent depreciation deduction). Even if one of the limited partnerships had an enforceable oral agreement to purchase a patent in 1976 investors could not have taken valid tax deductions until 1977 following the perfection of a valid written assignment of that patent.

■ With respect to the second contention, after reviewing the instructions given by the district judge, we conclude that the instructions, taken as a whole, adequately

---

1. A "willful" act element has been read into 26 U.S.C. § 7206(1) by *United States v. Brooksby*, 668 F.2d 1102, 1104 (9th Cir.1982). A "willful" act element has been read into 26 U.S.C.

§ 7206(2) by *United States v. Dahlstrom*, 713 F.2d 1423, 1426–27 (9th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984).

charged the jury on the issues of willfulness and specific intent. The district court was not required to give a "good faith belief" instruction with respect to the issue of the validity of oral patent purchase agreements because the jury was instructed to find specific intent as an element of section 7206(2) and the other federal statutes. We have held that the failure to give an instruction on a "good faith" defense is not fatal so long as the court clearly instructed the jury as to the necessity of "specific intent" as an element of a crime. *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984) *cert. denied*, 925 U.S. 474, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985); *citing United States v. Cusino*, 694 F.2d 185, 188 (9th Cir.1982), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983).

In sum, we hold that the district court correctly refused to instruct on the possibility of a valid oral assignment of a patent. Further, we hold that the court did not abuse its discretion by refusing to give a "good faith" instruction when the jury was adequately instructed on "specific intent."

## B. *Dahlstrom*

Defendants proposed a jury instruction, based on *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984), stating that if the jury found the legality of the patent tax shelter in question was unsettled, then they must vote for acquittal. The district court correctly refused to give the instruction.

In *Dahlstrom*, we reversed convictions for tax fraud and conspiracy to defraud the United States for two reasons. First, we concluded that the "unsettled legality" of the tax shelter scheme denied "fair notice" under the fifth amendment and made it impossible for the defendants to have a specific intent to "willfully" violate the federal statutes. Second, we concluded that because the defendants had only advocated the use of a complex tax shelter scheme involving foreign trusts and had taken no further steps to bring the scheme to frui-

tion, the first amendment protected them from criminal sanction.

Cases we have decided since *Dahlstrom*, however, have narrowed both its fifth amendment and first amendment prongs.

■ In *United States v. Schulman*, 817 F.2d 1355 (9th Cir.1987), we narrowed *Dahlstrom* to situations involving the " 'prosecution for *advocacy* of a tax shelter program' ... because such prosecution 'is offensive to the first and fifth amendments.' " *Id.* at 1359, quoting *Dahlstrom*, 713 F.2d at 1429. Here, appellants did far more than merely advocate the creation of patent tax shelters. Rather, they actively performed all the organizational and managerial tasks necessary to create and operate the tax shelters. They sought out patents available for purchase, enticed limited partner investors, inflated the cost bases of patents purchased, and filed erroneous partnership tax returns and other documents used in the preparation of tax returns. In sum, because defendants were closely involved in the creation and operation of the tax shelters they can draw no support from *Dahlstrom* or the first amendment. *See United States v. Crooks*, 804 F.2d 1441, 1449 (9th Cir.1986). *See also Akland v. Commissioner*, 767 F.2d 618, 621–22 (9th Cir.1985) (in a civil action for tax deficiencies and fraud, specific intent to defraud can be inferred from the nature and extent of defendant's involvement in the operation of foreign trust tax shelters).

■ In a case involving more than mere advocacy, the court must next inquire whether the law clearly prohibited the conduct alleged in the indictment. *Schulman*, 817 F.2d at 1359. Even if we were to assume that the tax shelter scheme was legal or of "unsettled legality" as it was envisioned, the defendants' administration of the mechanics of the limited partnership transactions was blatantly illegal. The indictment charged and the jury found that the defendants backdated the participation of limited partners in limited partnerships to the beginning of 1977. They were also found to have acted fraudulently as though patents purchased in 1977 had been pur-

chased in December 1976. Finally, for each of the limited partnerships, the jury found that the defendants had caused patents purchased for development to be accorded a fraudulently inflated value. Taken together, these affirmative acts of fraud move this case completely outside the scope of the fifth amendment. *See Crooks*, 804 F.2d at 1449; *United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Little*, 753 F.2d 1420, 1434 (9th Cir.1984).

It was not an abuse of discretion for the district court to refuse to give the proposed *Dahlstrom* instruction.

### C. *The mechanics of the tax shelter scheme*

■ Neither defendant objected during the trial to the failure of the district court to give more detailed instructions on the mechanics and potential legality of the patent tax shelter scheme. As a consequence, we review the failure to give the suggested instruction for "plain error." Fed.R. Crim.P. 52(b); *Cusino*, 694 F.2d at 188; *United States v. Giese*, 597 F.2d 1170, 1199 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). In applying this standard, we review the entire record of the trial and will reverse only if failure to do so will result in a "miscarriage of justice." *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985), quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982).

Defendants contend that the jury may have had difficulty understanding the complexities of their patent tax shelter program. They had proposed that the jury be instructed as to the facial legality of their tax scheme in order to forestall a jury conclusion that the scheme was fraudulent from its inception. After reviewing the district court's instructions, however, we do not believe that the failure to give more detailed instructions was "plain error." The district court's instructions were clear and correct. The jury was not instructed that the tax programs were fraudulent as

conceived but that they could find that they became fraudulent as carried out by the defendants.

## II. Sufficiency of Evidence

Nicoladze asserts that the evidence did not establish his criminal intent as a matter of law and fact. The argument comes in two stages. First, he contends that the tax shelter scheme was legal as envisioned. Second, he claims that any irregularities and illegalities that occurred—such as the inflating of patent cost values and backdating of transactions—were a result of Solomon acting alone without Nicoladze's knowledge or approval.

The first part of Nicoladze's argument, that the tax shelter scheme may have been legal as envisioned, is repetitive. In essence, the argument comes down to a *Dahlstrom* defense, which, for reasons noted, does not apply here.

■ As to the second part, that Nicoladze was involved only to the extent of "conceptualization" of the tax shelter scheme while Solomon actually performed any possibly illegal acts, there is substantial evidence in the record that contradicts this assertion of innocence. At trial, the government established Nicoladze's intimate involvement with Solomon and others in the promotion and management of the tax shelter scheme. The jury had sufficient evidence reasonably to conclude that Nicoladze had been a willful and knowing participant with Solomon in criminal violations. That is all the government had to prove.

## III. Admission of Documents

The district court received into evidence approximately 100 personal tax returns filed by limited partner participants in defendants' tax shelter partnerships. Appellants attack the admission of these documents alleging (1) a lack of relevancy under Fed.R.Evid. 402 and (2) a denial of sixth amendment rights to confrontation and cross-examination.

## A. *Relevancy*

Because defendants objected on constitutional grounds to the admission of the tax returns, we review their admission under a "harmless error beyond a reasonable doubt" standard. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Valle-Valdez,* 554 F.2d 911, 915 (9th Cir.1977).

■ The personal tax returns of limited partners in the tax shelter partnerships were clearly relevant to the government's case. The admission of the returns allowed the government to establish the "presentation" element of 26 U.S.C. § 7206(2). This section prohibits aiding and abetting the preparation and presentation of false income tax returns. For conviction, the government had to show that limited partners had actually either (1) claimed full-year deductions to which they were not entitled or (2) taken deductions derived from fraudulently dated patent assignments in returns presented to the IRS. Defendants contend that this purpose would have been served by the admission of the limited partnerships' K–1 returns, which by themselves, detailed the amounts of deductions passed through to individual limited partners. This contention fails to comprehend that the K–1's do not establish that the improper deductions were actually "presented" or taken by the individual limited partners within the meaning of section 7206(2).

■ In addition, the probative value of the personal tax returns was not outweighed by any danger of undue prejudice. *United States v. Beattie,* 594 F.2d 1327, 1330 (9th Cir.1979), is not to the contrary. In *Beattie,* a prosecution witness, testifying in connection with bank fraud and conspiracy charges, stated that the bank had charged off $315,000 in bad loans approved by the defendant when in fact only $17,000 in loan write-offs were related to the conspiracy charged. The testimony therefore permitted the jury to draw an enhanced inference as to the extent of the defendant's illegal conduct. For this reason, we reversed and remanded, finding that the possibility of undue prejudice made the testimony improper.

By contrast, in this action, the government's last witness, IRS agent Paul Perry, testified as to his estimation of the total amount of deductions attributable to defendants' tax shelter limited partnerships as partly reflected in the personal tax returns admitted into evidence. This testimony was competent because the government was entitled to attempt in this fashion to prove its conspiracy allegation. All of the limited partnership transactions in reference to which Perry testified resulted in personal deductions available to parties participating in limited partnerships named in the indictment. In addition, each personal tax return specified by name and amount deductions derived from participation in one or more of the limited partnerships.

## B. *Sixth Amendment*

■ In admitting the tax returns, the district court admitted a few returns filed by limited partners then deceased. The court also denied defendants' motion for a continuance to interview the remaining limited partners whose returns were to be offered into evidence. Appellants assert that they did not have an effective opportunity to cross-examine or confront these limited partners within the meaning of the confrontation clause of the sixth amendment. These arguments lack merit for two reasons. First, as verbal acts and public records, the returns were admitted not for the truth of their contents but to establish the existence of a limited partnership deduction. Cross-examining a limited partner after he or she has filed a return which claimed the deduction would be irrelevant. The deduction either was taken or it was not.[2] Second, even if a colorable confrontation clause violation occurred, any error that may have resulted was harmless beyond a reasonable doubt. The state of

2. Our examination of the personal tax returns admitted into evidence reveals that each incorporates specific references by name, date, and amount to losses stemming from ownership in terests in the limited partnerships charged in the indictment. Accordingly, each return helped the government to establish requisite elements of section 7206(1) and (2).

mind of the taxpayers was never an issue in this case. *See United States v. Regner,* 677 F.2d 754, 759 (9th Cir.) (even assuming that admission of foreign documents into evidence violated the confrontation clause such admission was harmless because there was sufficient other evidence to support the mail fraud conviction), *cert. denied,* 459 U.S. 911, 103 S.Ct. 220, 74 L.Ed.2d 175 (1982).

## IV. Prosecutorial Misconduct

This court reviews allegations of prosecutorial misconduct to consider whether the conduct "materially affected the fairness of the trial." *United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986), quoting *United States v. McKoy,* 771 F.2d 1207, 1212 (9th Cir.1985). If timely objection is made at trial, we review under a harmless error beyond a reasonable doubt standard. *Polizzi,* 801 F.2d at 1558. If timely objection is not made at trial, we review the prosecutor's conduct under the more exacting "plain error" standard. *Young,* 470 U.S. at 6, 16, 105 S.Ct. at 1042, 1047. *Young* also instructs that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context ... [to determine] whether the prosecutor's conduct affected the fairness of the trial." *Id.* at 11, 105 S.Ct. at 1044.

Appellants contend that the prosecutor's remarks, by hinting at the existence of additional evidence of criminal activity, improperly influenced the jury.

During closing argument to the jury, the prosecutor made two comments which appellants assert were improper. The first comment was a suggestion that the government suspected or knew of substantially more criminal violations by defendants than those charged in the indictment. Defendants' counsel registered his protest, and in response, the district court admonished the prosecutor not to mention or comment on any fraud not charged in the indictment. Later that morning during his rebuttal argument, the prosecutor referred to "30 or 40" blank patent purchase agree-

ments executed by Solomon and dated December 15, 1976, when the indictment alleged that only 20 were dated December 15, 1976, and that only eleven of those had been backdated. At the first recess defendants' counsel objected to the reference.

 We think the prosecutor's remarks did not exceed propriety because the indictment contained a conspiracy charge and the remarks could be taken as comment on the scope of the conspiracy. In any event, we need not characterize the quality of the remarks because the remarks, even if improper beyond a reasonable doubt, did not materially affect the fairness of the trial. The evidence of criminal activity presented in this case was of repeated and cumulative acts of fraud. The possibility that the jury might have inferred from the remarks that there may have been a greater number of questionable or illegal transactions than those charged in the indictment would not likely have been a determinative factor in their deliberations on whether fraud occurred.

## V. Jury Comments

 Just before discharging the jury, the district judge suggested to the jury that their deliberations would be best "kept to themselves." This admonition no doubt reflected the district court's hope that a retrial could be avoided.

Nicoladze asserts that these comments "had a chilling effect on their [the jury's] speech thereby interfering with defendant's right to a trial by a fair and impartial jury." This is nonsense. Nicoladze confuses the line of cases establishing a defendant's right to *Brady* material in the possession of the prosecution with the right of a court to control the post-verdict interrogation of jurors. There is no clear relationship between counsel's desire to inquire after the verdict and the right to a fair trial. The district court's comments to the jury prior to discharge were in no way improper and had no impact on the fairness of the trial.

## VI. Nicoladze's Increased Sentence

After the first conviction in this action, Nicoladze was sentenced to a total of five years in custody and a $15,000 fine. The first conviction was reversed on appeal and a new trial was held. After the second trial, Nicoladze received a sentence of six years in custody and a total fine of $20,000.

Under *North Carolina v. Pearce*, 395 U.S. 711, 726, 89 S.Ct. 2072, 2081, 23 L.Ed.2d 656 (1969), any increase in a defendant's sentence upon retrial after a successful appeal is "presumptively" vindictive unless the trial court identifies "objective information in the record justifying the increased sentence." *United States v. Goodwin*, 457 U.S. 368, 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982). Nicoladze asserts that the increase of one year in custody and $5,000 in fines was "vindictive" in violation of due process.

At sentencing after the retrial, the district court reviewed and noted the contents of a sentencing memorandum indicating that Nicoladze had continued his involvement in questionable tax sheltering activities after the first trial. Perhaps as a consequence, the district court conditioned Nicoladze's bail and probation on a cessation of such activities. The district court may have been concerned about Nicoladze's lack of remorse and continuing involvement in highly questionable tax sheltering schemes. While such concerns are potentially objective sentencing factors, they were not memorialized in the record as is required under *Pearce*. As a consequence, we have no choice but to vacate the sentence of Nicoladze. The sentence of Nicoladze is remanded to the district court for resentencing in accordance with the cases cited above. The sentence imposed upon Solomon is not disturbed.

## CONCLUSION

The judgments of the district court are affirmed as to all issues except the sentencing of Nicoladze. The Nicoladze case is remanded to the district court solely for resentencing pursuant to *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656.

AFFIRMED in part, VACATED in part and REMANDED.