**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**PORTAC, INC., Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Howard L. WOLF,**
**Defendant–Appellant.**

**Nos. 87–3132, 87–3178.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1988.

Decided March 9, 1989.

Irwin H. Schwartz, Seattle, Wash., for defendant-appellant Portac, Inc.

Nick Verwolf and Karen J. Vanderlaan, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for defendant-appellant Wolf.

Marion L. Jetton, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before POOLE, CANBY and
LEAVY, Circuit Judges.

CANBY, Circuit Judge:

Portac, Inc., a sawmill company, and Howard Wolf, an employee of Portac, appeal criminal convictions stemming from a conspiracy to rig bidding on a government timber sale held on March 22, 1985. Portac was charged with aiding and abetting the formation of a conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and 18 U.S.C. § 2 (1982). Howard Wolf was charged with making false material declarations under oath, before a grand jury investigating the rig bidding. 18 U.S. C. § 1623 (1982). We affirm both convictions.

## FACTS

On February 18, 1985, the U.S. Forest Service advertised that an estimated 8,100,-000 board feet of timber in Soleduck Ranger District would be auctioned on March 22, 1985, by competitive bidding. The sale was known as the "Up and Adam" timber sale. Three companies, Hoh River Timber Inc., ("Hoh River"), Astoria Plywood Corp., ("Astoria"), and Seattle–Snohomish Inc., ("Sea–Sno") submitted sealed bids, and were the only companies represented at the sale. Hoh River and Sea–Sno bid the minimum acceptable amount ($515,728) established by the Forest Service. Astoria bid $20.50 above the minimum amount. Evidence was introduced which tended to show that Hoh River had originally been prepared to bid up to $791,000. Although oral bids were allowed after the opening of the sealed bids, none of the three companies made an oral bid. The sale accordingly went to Astoria.

On February 23, 1987, a federal grand jury indicted Astoria, Hoh River, Portac Inc. ("Portac") and Howard Wolf, Portac's timber manager. Astoria and Hoh River were charged with conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The conspiracy was an agreement to refrain from bidding competitively against Astoria, which would then allocate logs from the sale among the conspirators and Portac. Astoria and Hoh River pleaded guilty to this conspiracy charge.[1] Portac was charged with having "willfully aided, abetted, counseled, commanded, induced or procured" the formation of the conspiracy in violation of 18 U.S.C. § 2. Wolf was charged with making false material declarations under oath before the grand jury, in violation of 18 U.S.C. § 1623.

The government's prime witness at trial was Dean Hurn. As president and manager of Hoh River, Hurn was responsible for bidding on Forest Service timber. Hurn's testimony revealed that Hoh River was interested in bidding on the sale because of

---

1. Astoria and Hoh River were also charged with other offenses, but those charges were dismissed when they pleaded guilty to conspiracy.

the timber's location and because "[i]t is very high grade wood." The day before the sale, Hurn and Wolf spoke and discussed Portac's desires for timber from the sale. Portac itself was not eligible to bid, because its parent company exports logs.

Hurn and Wolf also discussed the deal, by phone, on the morning of the sale. Hurn testified that, "I ... told [Wolf] that I was going to go see Norm Axon from Astoria Plywood ... I told Howard I was going to go down to the auction and we discussed, ... Astoria being there and Howard, the way that we left it was that I was to go to the timber sale and either bid the timber sale or try to make a, some type of a deal with Astoria on the timber sale." Wolf instructed Hurn to "see what Astoria had to say" about a deal and also informed him that Sea–Sno's buyer "wanted logs out [of] that timber sale."

On the morning of the sale, Norm Axon, (Astoria's timber manager), Neill Bowman, (Sea–Sno's timber manager), and Hurn met in the parking lot of the Soleduck Ranger Station. Bowman told Hurn "that ... he wanted logs out of that sale or was going to bid the timber sale." Hurn responded that Bowman "could get some logs out of that sale ... if we bought the sale." The three buyers then worked out the distribution of logs. Hurn's company would get the Hemlock and the other three companies (two bidders and Portac) would get the Douglas Fir. "[I]t was agreed that [Astoria would] buy the sale, [and] that [Hurn] wouldn't bid against them." When the sealed bids were opened, Hurn did not bid because he had agreed not to bid against his competitors.

After the auction Hurn called Wolf at Portac. Because Wolf was not available, Hurn spoke to Portac's president, Smokey Pittman, and "let him know what happened at the timber sale." The agreed division of logs from the Up and Adam Sale never came to pass. Approximately one year later, when Astoria's Norm Axon learned that a grand jury was investigating the sale, he announced that the agreement was off and Astoria would keep the logs.

Wolf testified at length before the grand jury, and he was ultimately charged with making 21 false declarations. He and Portac were tried together. Wolf was convicted of only two false statements, those being his answers to the last two of the following questions:

Q. Do you know whether or not Mr. Hurn had any contact with a representative of Astoria Plywood prior to the Up and At 'Em [sic] timber sale?

A. No.

Q. Do you have any reason to believe that he did?

A. *No.*

\*   \*   \*   \*   \*   \*

Q. Has anybody ever told you that a sale was rigged?

A. *No.*

After reaching a verdict separately against Wolf, the jury advised the court that it was unable to reach a verdict with regard to Portac and requested that the trial testimony of Dean Hurn be read to it. The judge read Hurn's testimony to the jury. Shortly thereafter a verdict of guilty was returned against Portac.

### ISSUES

Portac and Wolf raise a number of issues, with some overlap. They may be stated as follows:

**Portac:**

(1) Does the charge of aiding and abetting the formation of a conspiracy state an offense?

(2) Was the evidence sufficient to convict?

(3) Were the aiding and abetting charges against Portac improperly joined with the perjury charges against Wolf?

(4) Were statements of the deceased Norm Axon improperly admitted through hearsay?

(5) Did the prosecutor engage in improper final argument amounting to plain error?

(6) Did the trial court err in reading Hurn's testimony to the jury at its request?

**Wolf:**

(1) Did the indictment sufficiently allege perjury?

(2) Was the evidence sufficient to convict?

(3) Did the trial court err in admitting into evidence:

(a) testimony regarding statements of the deceased Norm Axon?

(b) guilty pleas of Astoria and Hoh River?

(c) telephone records of calls between the conspirators and Portac or Wolf?

(d) testimony regarding a statement made by Wolf?

(4) Did the trial court err in refusing to poll the jury until both verdicts were in?

### DISCUSSION—PORTAC

*Sufficiency of the Indictment*

█ Portac concedes that it is a crime to aid and abet an existing conspiracy, *see, e.g., United States v. Lane,* 514 F.2d 22, 26–27 (9th Cir.1975), but contends that it is not a crime to aid and abet the *formation* of a conspiracy. This argument overlooks the nature of the aiding and abetting statute, 18 U.S.C. § 2, which renders punishable as a principal anyone who "aids, abets, counsels, commands, induces or procures" the commission of an offense. One purpose of this provision is to make the former "accessory before the fact" a principal, and persons who aid in bringing about the later commission of a crime fall within its purview. *See Robinson v. United States,* 262 F.2d 645, 649–51 (9th Cir.1959) (quoting *Morei v. United States,* 127 F.2d 827, 830–32 (6th Cir.1942)); *United States v. Barnett,* 667 F.2d 835, 841 (9th Cir.1982). Thus "one can aid and abet a conspiracy by bringing the parties together to enter into an illicit agreement." *United States v. Galiffa,* 734 F.2d 306, 309 (7th Cir.1984). Portac's challenge to the indictment is therefore not well taken.

*Sufficiency of the Evidence*

█ With regard to our review of the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Portac contends that this minimal standard is not met because there is no evidence that Wolf knew of the meeting in the parking lot just before the sale, or that he shared the criminal intent of the conspirators. But the mere fact that Wolf may not have anticipated exactly when and where the meeting would take place is not enough to upset the verdict. One can aid and abet a conspiracy without knowing all the particulars. *United States v. Lane,* 514 F.2d at 27. There was evidence that Wolf was in contact with Axon and Hurn before the meeting, that he urged them to agree on the terms of the sale, and that he told Hurn to try first to get an agreement and to bid competitively only as an alternative. There was also evidence of post-sale conduct and communications by Wolf that indicated continuing support and participation in the agreed arrangement. From this evidence, a rational jury could find beyond a reasonable doubt that Wolf had aided and abetted the conspirators in getting together to rig the bids, and that he intended that result.

Portac contends that the actions of Wolf are not attributable to Portac because Pittman, Wolf's boss, had told Wolf that the company did not permit violation of any laws. But Wolf was Portac's sole purchaser of timber from Forest Service sales. "[A] corporation is liable under the Sherman Act for the acts of its agents in the scope of their employment, even though contrary to general corporate policy and express instructions to the agent." *United States v. Hilton Hotels Corp.,* 467 F.2d 1000, 1007 (9th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973). Wolf's acts are accordingly attributable to Portac.

*Prejudicial Misjoinder*

Portac next argues that it was unduly prejudicial to join Wolf's perjury charge

with the Sherman Act count against Portac. Portac argues that the perjury was not part of the common scheme, and that Wolf, unlike those in other joint perjury trials, was not charged with the substantive offense. *United States v. Barney*, 568 F.2d 134, 136 (9th Cir.) *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978).

■ Rule 8(b), Fed.R.Crim.P., provides that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction constituting an offense or offenses." The rule is to be construed broadly in favor of joinder. *United States v. Ford*, 632 F.2d 1354, 1373 (9th Cir.1980) *cert. denied sub nom. Armstrong v. United States*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). Joinder is proper when the same facts must be adduced to prove each of the joined offenses. *United States v. Satterfield*, 548 F.2d 1341, 1344 (9th Cir.1977), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978). In the present case, the charges against Portac and Wolf both relate to the bid rigging agreement and require the establishment of the conspiracy and Wolf's relation to it. "[T]he facts underlying the joined offenses were [therefore] so intertwined that most of the evidence admissible in proof of one was also admissible in proof of the other." *Barney*, 568 F.2d at 135. The two offenses were thus properly joined.

*Axon Hearsay*

The district court permitted Elmer Brown, Astoria's general manager, to testify to certain statements made by his timber buyer, Norm Axon, who died prior to trial. Brown testified that, three days after the Up and Adam Sale, Axon told him that Wolf had called him (Axon) the day before the sale and had asked Axon to meet with Hurn at breakfast on the morning of the sale. Brown also testified that Axon told him that the "four of them" (meaning Axon, Hurn, Bowman and Wolf)

had met in the parking lot before the sale and had rigged the bidding. It was apparent from all of the other evidence that the latter statement was wrong in saying that Wolf had been present; the government concedes that he was not at the meeting in the parking lot.

■ The district court admitted the testimony as statements of a coconspirator "during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Portac contends that Axon's statements do not qualify for admission because Portac (acting through Wolf) was not part of the conspiracy. But neither Portac nor Wolf need be charged or convicted as a conspirator with Axon or Astoria in order for Axon's statement to be admissible under Rule 801(d)(2)(E); participation as an aider and abettor is sufficient. *United States v. Fried*, 576 F.2d 787, 794 n. 8 (9th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed. 2d 241 (1978). A concert of action creates a coconspiracy for purposes of the evidence rule. *United States v. Ushakow*, 474 F.2d 1244, 1245 (9th Cir.1973); *United States v. Williams*, 435 F.2d 642, 645 (9th Cir.1970), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971).

■ Portac also argues that, because Axon's statements were made to Brown three days after the Up and Adam Sale, they could neither have been uttered during the conspiracy nor be in furtherance of it. The conspiracy need not be viewed that narrowly, however; an agreement was made to rig the bidding and to divide the logs from the sale. Indeed, the subsequent division was the prime incentive for the other conspirators to permit Astoria to win the bidding without competition. Because the objects of the conspiracy were still to be accomplished, Axon's statements were timely. *See United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir.1982) (conspiracy presumed to continue until there is affirmative evidence of abandonment). Moreover, Axon's statements furthered the intended division of logs to Portac, by indicating to

Brown that Wolf and Portac had helped Astoria to win the rigged bidding.

Axon's statements were therefore admissible under the coconspirator exception to the hearsay rule. By reason of that fact, they did not violate Portac's right of confrontation. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782, 97 L.Ed. 2d 144 (1987).[2]

*Prosecutor's Closing Argument*

■ In closing, the prosecutor argued that Wolf's motive in arranging the bid-rigging meeting was to keep log costs down and so "to do that he had to bring the bidders together, to encourage the bidders to make a deal, and that is what Howard Wolf did before the Up and Adam Sale." Portac argues that this statement was improper because there was no evidence that Wolf knew of the meeting in the parking lot. It is not necessary for conviction, however, that Wolf and Portac intended the meeting of the conspirators to occur at the exact time and place that it did. There was evidence that Wolf aided in bringing the conspirators together just before the sale. Whether the meeting occurred at breakfast, as Wolf suggested to Axon, or a few hours later in the parking lot, is not crucial. The prosecutor's argument, having support in the evidence and the reasonable inferences to be drawn from it, was not improper. In closing argument, both parties are allowed to " 'strike "hard blows" based upon the testimony and its inferences.' " *United States v. Birges*, 723 F.2d 666, 671–72 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 and 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984) (quoting *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir.1972)). There was no plain error[3] in the prosecutor's statements.

*Reading of Hurn Testimony*

■ Finally, Portac argues that the district court abused its discretion when it acceded to the jury's request and read Hurn's testimony. Portac contends that when the jury was initially unable to reach a verdict the judge should then have called a mistrial. *See Rogers v. United States*, 609 F.2d 1315, 1317 (9th Cir.1979). While the reading of testimony is disfavored, *United States v. De Palma*, 414 F.2d 394, 396 (9th Cir.1969), *cert. denied*, 396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690 (1970), a trial court enjoys great latitude in deciding whether to read testimony requested by a jury. *United States v. Nolan*, 700 F.2d 479, 486 (9th Cir.) *cert. denied*, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983); *United States v. King*, 552 F.2d 833, 850 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). The trial court cautioned the jury about the danger of concentrating on the testimony of only one witness and instructed the jurors to reach their decision on the basis of all of the evidence. In light of the entire circumstances, the reading of Hurn's testimony was not an abuse of the district court's broad discretion.

### DISCUSSION—WOLF

*Sufficiency of the Indictment*

■ Wolf contends that the indictment against him was deficient in several respects. First, he contends that the indictment failed to set the truth out in "stark contrast" to his allegedly false answers. He contends that the indictment's statement of the truth was impermissibly disjunctive. But the old, formal averments of truth in a perjury indictment are no longer required; it is enough that the indictment " 'shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.' " *United States v. DeCoito*, 764 F.2d 690, 693 (9th Cir.1985) (quoting Fed.R.Crim.P. 7(c)(1)).

2. Our disposition of this issue makes it unnecessary to rule upon the district court's alternative ground that Axon's statements qualified as admissions against interest. Fed.R.Evid. 804(b)(3).

3. We review for plain error because there was no objection to the prosecutor's argument. *United States v. Solomon*, 825 F.2d 1292, 1300 (9th Cir.1987), *cert. denied*, —— U.S. —— 108 S.Ct. 782, 98 L.Ed.2d 868 (1988).

In this case, the answers for which Wolf was convicted were categorical:

Q. Do you know whether or not Mr. Hurn had any contact with a representative of Astoria Plywood prior to the UP and At 'Em [sic] timber sale?

A. No.

Q. Do you have any reason to believe that he did?

A. *No.*

\* \* \* \* \* \*

Q. Has anybody ever told you that a sale was rigged?

A. *No.*

The indictment alleged that these answers were false; the opposite truth is apparent without the need for a particular averment. Wolf was given sufficient notice to permit him to prepare his defense, and the allegations are sufficiently precise to protect him from double jeopardy. The indictment was therefore sufficiently definite. *United States v. Bohonus,* 628 F.2d 1167, 1173 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980).

■ We also reject Wolf's contention that whether he had "reason to believe" that Hurn had met with a representative of Astoria before the sale was inherently so ambiguous that it could not support a conviction. The meaning of the question must be considered in context, and the issue is whether persons of ordinary intelligence could agree on the meaning of the language or use it with mutual understanding. *United States v. Lighte,* 782 F.2d 367, 375 (2d Cir.1986). We conclude that, in the context in which it was asked, the question to Wolf was quite understandable.

## Sufficiency of the Evidence

■ Wolf contends that there was insufficient evidence to sustain his conviction for either of the two answers that the jury found to be false. We disagree. Hurn testified that he talked to Wolf on the telephone just prior to the sale, and told him that he was going to "go down and see what Astoria had to say and if there was something that could be done, and if there wasn't, then to bid the timber sale." This evidence was enough to permit the jury to find beyond a reasonable doubt that Wolf had reason to believe that Hurn contacted Astoria before the sale. Additional reason to believe may be found in Wolf's telephone call to Astoria's Axon the night before the sale, urging him to have breakfast with Hurn.

The evidence to support the falsity of Wolf's other answer, that nobody had ever told him that a sale was rigged, is more circumstantial but still sufficient. It is true that there is no direct testimony by anyone saying that he told Wolf point-blank that the sale was rigged. There was evidence, however, from which the jury could infer that Wolf was told of the results of the sale by telephone. There was also testimony by Hurn that he conveyed to Wolf the statement of Axon that the deal for division of the logs was off because the sale was under investigation. If, contrary to our view, this evidence is not sufficient to establish that anybody "told" Wolf that "a sale was rigged," the deficiency would not require reversal. Wolf's conviction of the single count of perjury was supported by the jury's finding that he answered each of the two questions falsely. Either finding supports the conviction.

## Evidentiary Issues

The first of Wolf's contentions, that Elmer Brown's testimony regarding the statements of Norm Axon should not have been admitted, is disposed of in our discussion of the same issue raised by Portac. The statements were admissible under Fed. R.Evid. 801(d)(2)(E).

■ Wolf next argues that it was error to admit the guilty pleas entered by Astoria and Hoh River. The government was entitled, however, to disclose the terms of the plea agreements of those two companies in order for the jury to assess the credibility of their two officers, Brown and Hurn, who testified against Wolf. *See*

*United States v. Roberts,* 618 F.2d 530, 535 (9th Cir.1980), *United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101, 1109 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). The trial court instructed the jury that the convictions were to be considered only for purposes of credibility of the witnesses. We find no abuse of discretion.

■ Wolf also contends that the trial court erred in admitting telephone records showing calls between Astoria, Hoh River, Portac and Wolf. He argues that the records should not have been admitted without evidence concerning the identity of the callers and the subjects of the conversation. The records, however, are probative of the fact that calls were made at the times indicated. The jury was entitled to consider that fact along with all the other circumstances that tended to show a conspiracy to rig the bidding. *See United States v. Polizzi,* 500 F.2d 856, 905–06 (9th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. Roselli,* 432 F.2d 879, 896 n. 31 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

At trial, Marvin McDougal testified that, about one year after the Up and Adam Sale, Wolf explained to McDougal his bidding philosophy and told McDougal that he was being too aggressive. Wolf suggested that it is better to "give" a little (be cooperative). McDougal testified that Hurn was present at this conversation. Wolf contends that this evidence was far afield from the Sale and could only have been introduced impermissibly to show Wolf to be a "bad person."

■ Wolf's statement qualifies as an admission of a party, however. Fed.R. Evid. 801(d)(2). To the extent that it shows a practice of Wolf's of "cooperative" bidding constituting bad acts, it is admissible to show motive, intent, and absence of mistake. Fed.R.Evid. 404(b). The trial court determined that the probative value of the evidence was not substantially out-weighed by the danger of unfair prejudice, Fed.R. Evid. 403, and we find no abuse of discretion in that determination.

*Jury Poll*

■ Finally, Wolf claims that it was error for the court to wait until the jury had finished deliberations on all counts before conducting a poll. A trial court has substantial discretion to decide how a jury should be polled. *United States v. Lustig,* 555 F.2d 737, 746 (9th Cir.1977), *cert. denied,* 434 U.S. 926, 1045, 98 S.Ct. 408, 889, 54 L.Ed.2d 285, 795 (1978). The contention, by Wolf, that the jurors would have forgotten feelings of coercion in the interim four day period of deliberation is without merit. Polling the jury before it finished the deliberations could easily have disrupted or prejudiced the proceedings. The trial court acted well within its discretion.

CONCLUSION

The indictments and the evidence against both Portac and Wolf were sufficient. The charges were properly tried together. No reversible errors occurred during trial. The convictions of Portac and Wolf are

AFFIRMED.