907 F.2d 1141
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Timmy L. STEPHENSON, Defendant-Appellant.
 No. 89-5007.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1990.
Decided June 12, 1990.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (CR-88-36).
 John Joseph Butler, Adams, McCullough & Beard, Raleigh, N.C., for appellant.
 Thomas Ernest Booth, United States Department of Justice, Washington, D.C., (Argued), for appellee; Margaret P. Currin, United States Attorney, Solomon Wisenberg, Assistant United States Attorney, Raleigh, North Carolina, on brief.
 E.D.N.C.
 AFFIRMED.
 Before MURNAGHAN, Circuit Judge, BUTZNER, Senior Circuit Judge, and FRANK A. KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Timmy Stephenson was charged with perjury before a grand jury, 18 U.S.C. Sec. 1621, and being an accessory to armed robbery after the fact or aiding and abetting an accessory after the fact to armed robbery, 18 U.S.C. Sec. 2, Sec. 3. After a jury trial, Stephenson was convicted on all charges and sentenced to nine months in prison and three years of supervised release. He has appealed on several issues:
 
 
 2
 I. Were the false statements made by Stephenson to the grand jury material to its investigation?
 
 
 3
 II. Was there sufficient evidence that Stephenson shared an intent to prevent Danny Stewart's apprehension?
 
 
 4
 III. Were the district court's jury instructions on aiding and abetting plain error?
 
 
 5
 IV. Is Stephenson entitled to a new trial because of improper bolstering of testimony by reference to a lie detector test and admission of extra-judicial hearsay?
 
 I.
 
 6
 It all began with a bank robbery in Knightsdale, North Carolina, on May 5, 1988. On that day three men, Danny Stewart (appellant's cousin), Donald Stephenson (no relation), and Troy Lindsay, robbed at gunpoint a federally insured bank of $8,731. After the robbery, the three drove to Stephenson's auto repair shop, A & G's Truckstop. What happened at the garage was the subject of dispute at trial. According to Lindsay, who had negotiated a plea bargain with the government that included a promise of his truthful testimony, when the three arrived at Stephenson's garage Timmy Stephenson and Stewart drove to Stephenson's house in Stephenson's van while Stewart held the money, still in its bag. Stewart later called the other two at the garage and told them to meet at Stephenson's house. Lindsay testified to seeing Stephenson wash the money in vinegar to remove the red dye left there from a dye bomb that had exploded as the robbers were fleeing the bank. According to Lindsay, Stephenson also directed Lindsay to abandon the getaway car in a nearby parking lot. Stephenson, in contrast, testified that he never saw the money and that he was outside his home talking to a customer while the three robbers were inside and that he was unaware of the robbery. Stewart corroborated Stephenson's account at trial but added that "I guess [Timmy] knew that I got it [the money] in a robbery or assumed it."
 
 
 7
 Later that evening, Stewart and his girlfriend Sherrie picked up Lindsay in Stephenson's car and returned to the parking lot where they burned the getaway car. Stephenson had been working on Sherrie's car at his garage and has contended that he lent Stewart his car only to pick up Sherrie from work until Sherrie's car was fixed. Stephenson was of the opinion that he would get his car back the following morning.
 
 
 8
 The next evening Sherrie came by Stephenson's shop and told him that Stewart was supposed to have returned the car that evening. Later that same evening, two FBI agents interviewed Stephenson at his home to learn why Stewart, by that time a suspect in the robbery and known to have been driving Stephenson's car, had possession of Stephenson's car. Stephenson explained to the agents that he had lent Stewart the car to pick up Sherrie, and that, because he was working under a car at the time the trio stopped by, he had not seen Lindsay on the day of the robbery. At the agents' suggestion, Stephenson reported the car stolen. Largely because of the report, Donald Stephenson, by then driving the car, was apprehended five days later on May 11, 1988.
 
 
 9
 Meanwhile, on May 10, Stewart and Lindsay were charged with bank robbery and warrants were issued for their arrest. On May 11, the FBI served Stephenson with a grand jury subpoena and told him about the arrest warrants. The agents also told Stephenson that it was unlawful to harbor, conceal, or assist a federal fugitive. After the arrest of Donald Stephenson, Stephenson got his car back. He consented to a search of the car and assisted the agents in identifying what items in the car were his and what belonged to Donald Stephenson.
 
 
 10
 Stewart and Lindsay had by now made their way to Savannah, Georgia, where on May 14 they were arrested for shoplifting. Stewart advised the local police that he was wanted for bank robbery in North Carolina, but a computer check came up negative and he was allowed to post bail. He called his father, Wilson Stewart, to bail him out and told him that the Savannah police had run a check on him and he was not wanted for anything. (Wilson Stewart, however, knew differently as Lindsay testified that Stewart had asked his father to keep the stolen money and his father had refused.) Wilson Stewart asked Stephenson to drive with him as he did not know the area where his son was confined and Stephenson, a former truck driver, did. Stephenson testified that he did not believe that Stewart committed the robbery, assuming, because the computer check cleared him, that he was no longer wanted.
 
 
 11
 The next day, May 15, Wilson Stewart and Stephenson arrived in Savannah and Wilson Stewart bailed out his son. Stephenson did not take an active part in bailing out Stewart. After posting bail, the pair, with Stephenson driving, took Stewart to the apartment at which he was staying to get his car. Stephenson and Wilson Stewart then drove back to North Carolina, with Stewart supposedly following, though neither saw him after the trip to North Carolina got under way.
 
 
 12
 On May 18, pursuant to his subpoena, Stephenson appeared before the grand jury. He testified falsely that he had not seen Stewart since Stewart took his car. He flatly denied having any information concerning Stewart's or Lindsay's current whereabouts.
 
 
 13
 On August 16, 1988, the government indicted Stephenson as an accessory after the fact to armed bank robbery by helping to bail Stewart out, and with aiding and abetting an accessory after the fact, Wilson Stewart. Count Ten of the indictment further charged that Stephenson materially perjured himself before the grand jury in violation of 18 U.S.C. Sec. 1621. After a jury verdict against him on all counts, Stephenson was sentenced to nine months in jail with three years of supervised probation. In addition he was ordered to pay a prorated share of restitution totaling $3,292.75. Stephenson's appeal is in forma pauperis.
 
 II.
 A. Grand Jury Testimony
 
 14
 While admitting that aspects of his grand jury testimony were false, Stephenson has contended that his statements that he had not seen Stewart since Stewart took his car and that he had no knowledge of either Stewart's or Lindsay's whereabouts were not material to the grand jury's investigation. Because the grand jury was only investigating the robbery and the burning of the getaway car, Stephenson has argued that his failure to admit that he had seen Stewart in Savannah did not impede the grand jury's investigation of the bank robbery.
 
 
 15
 A false statement is material if it has the "natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." United States v. Friedhaber, 856 F.2d 640, 642 (4th Cir.1988) (en banc ) (citations omitted). Materiality is a question of law for the court. United States v. Farham, 791 F.2d 331, 333 (4th Cir.1986). The false statement need not actually impede the grand jury's investigation; it is material if it is "capable of influencing the grand jury on the issue before it." Friedhaber, 856 F.2d at 642.
 
 
 16
 FBI Agent Thomas testified at trial that the grand jury was conducting, inter alia, an investigation to locate Stewart and Lindsay. Such a scope certainly made Stephenson's false statements material. By concealing from the grand jury that he had indeed seen Stewart in Savannah two days before his testimony and that, for all he knew, Lindsay might still be in jail there, his testimony cannot be said to be immaterial. The issue need not involve the primary subject under investigation (i.e., the robbery), but may relate to a subsidiary or collateral matter (here the current location of Stewart and Lindsay). See United States v. Thompson, 637 F.2d 267, 268 n. 2 (5th Cir.1981); United States v. Percell, 526 F.2d 189. 190 (9th Cir.1975). Under such a standard, Stephenson's testimony was material.
 
 
 17
 Stephenson also has argued that his negative response to the question: "[d]o you have any information about where Danny Stewart is or where Troy Lindsay is?" was literally true. At the time of that question, Stephenson had not seen Stewart for two days.
 
 
 18
 While Stephenson does have a semantic point, it is obvious that the government was not seeking information about the suspect's whereabouts at that second. A question must be considered in context and given its common sense meaning. See United States v. Portac, Inc., 869 F.2d 1288, 1296 (9th Cir.1988). Furthermore, if a perjury count alleges multiple instances of false testimony and the evidence is sufficient with respect to at least one of the specifications, the conviction may stand. See United States v. Serola, 767 F.2d 364, 373 (7th Cir.1985); United States v. Raftery, 563 F.2d 965, 966 (9th Cir.1977). Thus, even if the answer was literally true in the case of one question, the perjury conviction can still stand in view of other falsehoods.
 
 B. Aiding and Abetting
 
 19
 The indictment in Count Nine alleged that Stephenson knowingly assisted a fugitive (Danny Stewart) in order to prevent his apprehension, and aided and abetted Wilson Stewart to commit that offense. Stephenson has argued that, because an essential element of the crime is the intent to prevent apprehension, trial or punishment, it was error for the trial court not to dismiss. Stephenson has based the contention on the undisputed testimony that he knew Stewart had told his jailers that he may have been wanted by the FBI and that yet the jailers let him go anyway. Thus, his argument runs, there was no evidence that Stephenson knew that Wilson Stewart's act of posting bond for Stewart, certainly legal under Georgia law, was a criminal act. In that connection, Stephenson has also relied on the fact that it was Wilson Stewart, not Stephenson, who actually bailed Stewart out of jail.
 
 
 20
 However, the jury could well have believed Lindsay's testimony concerning Stephenson's prior assistance immediately after the robbery. The government has pointed out that the jury could properly have concluded that Stephenson knew Wilson Stewart's aim in posting his son's bond was to assist Stewart in avoiding apprehension. In that event, there would have been a shared intent by Stephenson in his assisting Wilson Stewart by driving him to and from Savannah for the purpose of posting bond to aid Danny Stewart in avoiding apprehension.
 
 
 21
 In addition to Lindsay's testimony, the FBI agent testified that he had told Stephenson about the warrants and explained aiding and abetting three days before the trip to Georgia. Perhaps Stephenson, as he testified, thought Stewart was no longer wanted. It was nevertheless just as reasonable for the jury to conclude that Stephenson, knowing Stewart had robbed a bank, helped Wilson Stewart bail out his son in order to help Stewart avoid apprehension. Cf. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982) ("[T]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether ... any rational trier of facts could have found the defendant guilty beyond a reasonable doubt.").
 
 
 22
 Stephenson next challenged the district judge's instructions on aiding and abetting. The judge did not state that an aider and abettor has to share the principal's criminal intent. As appellant did not object to the court's instruction at trial, the issue is reviewed for plain error. United States v. Chavis, 880 F.2d 788, 794 (4th Cir.1989). The plain error standard requires the defendant to show that the error resulted in a miscarriage of justice. United States v. Young, 475 U.S. 1, 15-16 (1985).
 
 
 23
 The district court charged the jury that a person aids and abets another by "willfully joining together with that person in the commission of the crime." The judge additionally explained that the crime required that the defendant "willfully associate himself in some way with the crime and willfully participate in it," and that merely being a "knowing spectator" was insufficient. At the beginning of the charge, the judge defined several words for the jury. He defined willfully as meaning that "an act was committed voluntarily and purposely with the specific intent to do something which the law forbids."
 
 
 24
 Appellant did not request an instruction concerning "shared criminal intent" or object to the instructions as given. Indeed, the standard jury instruction on aiding and abetting does not include the "shared criminal intent" phrase but instead uses the "willfulness" terminology. See 1 Devitt & Blackmar, Federal Jury Practice and Instructions Secs. 12.02, 12.03 (1977); United States v. Wright, 742 F.2d 1215, 1221 (9th Cir.1984). In light of the instructions which were given, which essentially provided the substance of what Stephenson has argued for, the alleged error cannot be said to have resulted in a miscarriage of justice.
 
 III.
 
 25
 Clearly the most damaging evidence against Stephenson came from Lindsay. It was he who testified that Stephenson had helped wash the dye from the money, that Stephenson had lent Stewart his car to get away and that Stephenson still retained the robbery proceeds. Significantly, Stephenson was not charged in the indictment with any of the facts involving him as testified to by Lindsay. The government did not know of the accusations until an interview with Lindsay three days before trial. Stephenson testified that he did not, in fact, have the money and Stewart admitted that Stewart still had the proceeds. Stephenson has contended that Lindsay's testimony was motivated by revenge because, as confirmed by FBI Agent Thomas, Stephenson was instrumental in encouraging Lindsay to give himself up. Lindsay testified, however, that Stephenson had not so encouraged him, testimony in direct contrast to that of the FBI agent who heard Stephenson's end of the conversation.
 
 
 26
 Nevertheless, the jury may well have believed Lindsay's version of the events and that, consequently, Stephenson did share an intent with Wilson Stewart to aid and abet the robbers in avoiding apprehension. The evidence did permit such a jury finding, unless there was error in two rulings made by the district judge and claimed by Stephenson to be erroneous.
 
 A. Lie Detector References
 
 27
 On direct examination, Lindsay admitted that he had entered into a plea agreement with the government that required him to testify against his former accomplices. The agreement also required Lindsay to take a lie detector test, a fact not mentioned until recross-examination by Stephenson's attorney. During that examination, Stephenson's attorney asked Lindsay whether he had seen anybody from the U.S. Attorney's Office. Lindsay answered "When I took the lie detector." Instead of objecting, the attorney went ahead and asked, "And you had to pass that lie detector test in order for this plea to go through for you, didn't you?" After Lindsay responded that he did not know, the prosecutor interrupted the cross and asked for a bench conference. During the conference the district judge ordered Stephenson's counsel not to talk about the lie detector any further. The judge then asked if "anybody wants me to give a curative instruction." Both Stephenson's counsel and the government declined the offer. Stephenson's counsel did not move for a mistrial. The court further determined that the initial reference to the polygraph was "inadvertent."
 
 
 28
 Now, on appeal, Stephenson's new lawyer contends that the reference to the polygraph was reversible error. There is little question that evidence of a polygraph test is inadmissible. United States v. Brevard, 739 F.2d 180, 182 (4th Cir.1984). "Where an impermissible reference to a polygraph has been interjected, the court usually may cure the error by striking the evidence and instructing the jury to disregard it." Id. However, the court has held that (1) when the inference about the result of the test may be critical in assessing the witness' credibility, and (2) when the witness' credibility is vital to the case, a curative instruction may not be enough and reversal may be required. United States v. Tedder, 801 F.2d 1437, 1444 (4th Cir.1986); Brevard, 739 F.2d at 183.*
 
 
 29
 Taking the second factor first, Lindsay's testimony was the main evidence linking Stephenson to the robbery. Lindsay even stated that Stephenson helped wash the money. Thus, there is little doubt that this witness was central to the government's case. Nevertheless, while there was no direct evidence from other sources that tied Stephenson to the robbers' efforts to avoid detection, it was reasonable for the jury to make such an inference from Stephenson's act in lending the car as well as from his sudden recollection that he was conveniently outside talking to a customer when the money was supposedly being washed. Though a close question, we conclude that Lindsay's testimony, while damaging to Stephenson, was not the only evidence linking Stephenson to the robbers' efforts at avoiding detection.
 
 
 30
 It is also unclear whether the result of the test was critical in assessing Lindsay's credibility. In Tedder, which upheld the conviction, Chief Judge Winter stated:
 
 
 31
 Thus, even if some jurors drew an inference about the results of the test, there is no special reason in this case to believe that the inference was any more critical in assessing the witness's credibility than it was in cases in which a curative instruction was found to be sufficient.
 
 
 32
 801 F.2d at 1445.
 
 
 33
 It was not the government that compounded the error of Lindsay's inadvertent mention of the lie detector test, but rather Stephenson's counsel. It was the government that interrupted the proceedings to stop references to the test. Under those circumstances, it was not plain or reversible error for the district judge to have failed sua sponte to issue a curative instruction. He offered one and it was declined.
 
 
 34
 B. Lindsay's Reference to Stewart's Extrajudicial Statement
 
 
 35
 On redirect examination, Lindsay stated that Danny told him that "Timmy Stephenson's got [the robbery money]." At that point, Stephenson's counsel objected and moved to strike. The court ruled that the testimony was a hearsay exception, without articulating which one. The government has argued that, under Fed.R.Evid. 801(d)(2)(E), a co-conspirator's extrajudicial statement made "during the course of and in furtherance of the conspiracy" is admissible. However, Stephenson has pointed out that, for the exception to apply, the defendant and the declarant (Stewart and Stephenson, not Stewart and Lindsay) must be members of the conspiracy. J. Weinstein & M. Berger, Weinstein's Evidence Sec. 801(d)(2)(E), at 801-244 (1988).
 
 
 36
 Assuming (without deciding) that the government's contention thus fails on that ground, the government also argues that any error was harmless. On cross-examination, Stewart noted that he (Danny) had stashed the stolen money near a pond before fleeing the state. Consequently, even if improperly admitted, we agree the error was harmless and do not find a new trial to be warranted.
 
 Accordingly, the judgment is
 
 37
 AFFIRMED.
 
 
 
 *
 In Brevard, the government agent referred to a polygraph test that had been performed on the defendant Brevard himself