872 F.2d 1410
 57 USLW 2641, 1989-1 Trade Cases 68,544
 PEOPLE OF the STATE OF CALIFORNIA; City of Long Beach, as
Trustee for the State of California, and the State
of California as Beneficiary,
Plaintiffs-Appellants,
v.
CHEVRON CORPORATION; Unocal Corporation; Mobil Oil
Corporation; Shell Oil Company; Shell California
Production, Inc.; Exxon Corporation; Exxon Company, USA;
Texaco, Inc., Defendants-Appellees.
In re COORDINATED PRETRIAL PROCEEDINGS IN THE PETROLEUM
PRODUCTS ANTITRUST LITIGATION.
CITY OF LONG BEACH, as trustee for the State of California,
and the State of California as beneficiary,
Plaintiff-Appellant,
v.
STANDARD OIL COMPANY OF CALIFORNIA, et al., Defendants-Appellees.
 Nos. 87-6300, 87-6629, 87-6301 and 87-6628.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 4, 1988.
Decided April 17, 1989.
As amended July 7, 1989.
 
 Gary L. Halling, Broad, Schulz, Larson & Wineberg, San Francisco, Cal., for plaintiffs-appellants.
 Darryl Snider, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before SCHROEDER, FARRIS and POOLE, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 We have before us for decision in this opinion two separate appeals arising from two separate actions filed by the City of Long Beach and the State of California against the defendant oil companies. The cases are but a part of long-standing litigation between these parties stemming from 1965 contracts between the City and the defendants for the sale of oil from the City's Wilmington offshore oil field tract.[1]
 
 
 2
 The first appeal we decide in this opinion, City of Long Beach v. Standard Oil Co., Nos. 87-6301 & 87-6628, involves the same district court action that spawned the separate appeal and opinion in Nos. 86-5859 & 86-5860, City of Long Beach v. Standard Oil Co., 872 F.2d 1401 (9th Cir.1989), which we also decide today in a separate opinion. We refer to this underlying action as "Long Beach I." The Long Beach I complaint alleged violations of the Sherman Act, California's Cartwright Act, and breach of contract, all resulting from alleged anticompetitive price fixing engaged in by the defendant oil companies. The other opinion today decides the appeal from the district court's grant of summary judgment against the plaintiffs on the antitrust counts of that complaint, and this opinion decides the appeal from the district court's award of summary judgment against the plaintiffs on the pendent state law claims. In the other opinion we reverse the dismissal of the antitrust claims, and we here reverse the dismissal of the pendent claims.
 
 
 3
 The second appeal decided in this opinion, State of California v. Chevron Corp., Nos. 87-6300 & 87-6629, is from a grant of summary judgment in favor of the oil companies in a separate action brought by the same plaintiffs against the same defendants, but concerning a later time period. We refer to this action as "Long Beach II." The plaintiffs originally filed Long Beach II in California state court alleging only claims arising under state law. The defendants removed the case to federal court and the district court accepted jurisdiction. The court awarded partial summary judgment to the defendants on the theory that the claims asserted were essentially the same as the pendent claims asserted in Long Beach I on which it had earlier awarded summary judgment for the defendants. Thus the district court's exercise of jurisdiction was predicated upon the validity of its original judgment on the pendent claims in Long Beach I. Because we reverse the Long Beach I judgment, we must reverse the Long Beach II judgment as well.
 
 
 4
 All grants of partial summary judgment were certified by the district court as proper interlocutory appeals under Fed.R.Civ.P. 54(b). This court has jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 
 5
 II. LONG BEACH I --THE PENDENT CLAIM FOR BREACH OF THE
 
 COVENANT OF GOOD FAITH AND FAIR DEALING IN THE
 
 6
 UNDERLYING CONTRACT.
 
 
 7
 In March of 1965 plaintiff City of Long Beach entered into a contract with the defendant oil companies[2] and other oil companies[3] to convey to them substantial shares of the oil and gas production at the City's Wilmington offshore oil field tract. The oil companies were to drill for the oil and maintain the offshore oil production platforms, paying the City for all the oil produced.
 
 
 8
 The contract contained detailed provisions specifying the price the City was to receive. The oil companies were to pay the highest price computed by one of the four alternative methods contained in Article 9(b) of the contract:
 
 
 9
 1. The arithmetical average of the prices posted in the Field[4] by Continuing Purchasers ... during the month....
 
 
 10
 2. The arithmetical average of the prices posted in the Named Fields[5] by Continuing Purchasers ... during the month....
 
 
 11
 3. The weighted average of the Prices Paid by Substantial Purchasers for purchases of oil in the Field ... during the calendar month....
 
 
 12
 4. The weighted average of the Prices Paid by Substantial Purchasers for purchases of oil in the Named Fields ... during the calendar month....
 
 
 13
 If none of these four methods yielded an ascertainable price, then the contract provided that the oil sold was to be valued at "the actual current market price of such oil at the point of delivery determined on the basis of all available relevant and reliable information." The contract also contained a "most favored nation" clause, which ensured that the City received the highest price for any oil from the field purchased or exchanged by oil companies on a given day.
 
 
 14
 As can be seen from the contract terms, the price to be paid to the City was the higher of the price either actually paid by an oil company, or else posted by it. A posted price is a public announcement of prices that a crude oil buyer is willing to pay for crude oil of a particular gravity from a particular oil field. Only prices posted by "Continuing Purchasers" were to be used in the price computation. A "Continuing Purchaser" is defined by the contract as a purchaser who made certain minimum average daily purchases of oil in the previous year. These minimums were fairly large, being 1,000 barrels per day in the first year of the contract, and thereafter the lesser of 3,000 barrels per day or two and one-half percent of the average daily tract allocation. The oil companies were not required to post prices, and not every company actually did; Chevron, Arco, Mobil, and Union were the only purchasers regularly to post prices for the Wilmington field during the relevant period. The contract contained no explicit guidelines for determining the price to be posted.
 
 
 15
 The City alleges that the oil companies, beginning sometime after the contract was signed and continuing at least through 1975, engaged in anticompetitive price fixing by posting and using prices that featured artifically high gravity price differentials, meaning that the companies paid too low a price for the heavier grades of crude produced at the Wilmington field. In addition to its antitrust allegations, the City alleged that the oil companies breached the express terms of the contract and violated statutory and common law duties of good faith and fair dealing by failing to set their prices in good faith and by failing to pay for the full value of oil they acquired as required by Article 9(b) of the contract.
 
 
 16
 The trial court granted summary judgment for the oil companies because it found that the contract did not obligate the oil companies to post a "true market price" for the oil. The court noted that the oil companies were under no obligation to post at all, and that a company desiring more or less incoming crude could post its prices lower or higher than the price posted by other companies in order to achieve this. It further observed that the parties had originally considered and rejected the idea of using fair market value as the sole pricing standard instead of using the posting/payment standards contained in Article 9(b).
 
 
 17
 As defendants point out, posting is only one part of an elaborate pricing scheme established by the City in order to obtain the highest possible price for its oil. That scheme includes several protection mechanisms meant to guard against posted prices that are too low. To begin with, the City receives the price of oil actually sold if that price exceeds the posted price, and the contract contains safeguard provisions to prevent an artifically high or low actual sales price from being used as an index price. Also, the only posted prices used are those of Continuing Purchasers who have a history of actually purchasing large quantities of crude oil from the field. Finally, the true market value of the oil as derived from other information sources is specified as a fallback price index if the four specific posting/payment price provisions fail to provide an ascertainable value for the oil.
 
 
 18
 We agree with defendants and the district court that this carefully-drawn contract did not require defendants to post only one price, the "true market price" of the oil. The defendants were allowed to post any price they wished, so long as they posted their price in good faith. California law implies in every contract a covenant of good faith and fair dealing. Seaman's Direct Buying Serv. v. Standard Oil Co., 36 Cal.3d 752, 768, 206 Cal.Rptr. 354, 362, 686 P.2d 1158, 1166 (1984); Cal.Com.Code Sec. 1203. Good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Cal.Com.Code Sec. 2103. California law further requires that a party granted discretionary power under a contract, including the discretionary power to set prices, exercise that power in good faith. Perdue v. Crocker Nat'l Bank, 38 Cal.3d 913, 923, 216 Cal.Rptr. 345, 352, 702 P.2d 503, 510 (1985), appeal dismissed, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986); Cal.Com.Code Sec. 2305(2).
 
 
 19
 The plaintiffs, however, do not claim that the contract required defendants to post the "true market price" of the oil. Rather, they claim that the contract required the defendants to perform all contract activities, including price posting, in a good faith manner that would lead to the determination of a fair price to be paid, as contemplated by all parties when they entered the agreement. The plaintiffs claim that the alleged anticompetitive price fixing circumvented the good faith expectations of the parties and converted an otherwise proper act like price posting into an exercise of bad faith.
 
 
 20
 The plaintiffs' claims have merit. The contractual right to post prices does not grant the defendants freedom to post artificially depressed anticompetitive prices in bad faith. The posted price provisions of Article 9(b) were put in the contract with a purpose; all parties must have intended the postings to serve as one reliable index, although not the only one, of the true value of the oil in a competitive market. The parties intended that the oil companies would be free to post a higher or lower price and bring on the consequences of a smaller or larger incoming supply, as noted by the district court. This is what would have happened, of course, in a competitive environment.
 
 
 21
 However, if as the City alleges, the oil companies engaged in anticompetitive activity, the market forces that would normally control price posting decisions would cease to operate. Industry-wide posting of artificially depressed prices, coupled with use of three-cut exchanges that avoided dollar denomination of inter-company barter transactions, would destroy the value of the Article 9(b) pricing provisions as valid price indices. Regardless of the discretion granted by the contract, the posting of artificially depressed prices, like any other act in furtherance of the alleged anticompetitive behavior, would constitute a breach of good faith. Compliance with the letter of a contract's provisions does not constitute good faith if one's bad faith actions render those provisions invalid or inoperative.
 
 
 22
 Thus, the same anticompetitive price posting that would violate the antitrust law would also constitute bad faith dealing in violation of the state law duty of good faith imposed by Cal.Com.Code Sec. 1203. The same questions of material fact that we find today regarding the antitrust claims in City of Long Beach v. Standard Oil Co. also operate as questions of material fact regarding the elements of breach of duty of good faith. For that reason, the pendent claims considered here must be remanded to the district court along with the antitrust claims remanded in that case.
 
 
 23
 We note, however, that the plaintiff's antitrust claim and the breach of good faith claim are both predicated on the same conduct of the defendants, the anti-competitive price posting. They also both result in the same harm, underpayment to the City for its oil. On remand, therefore, the district court should take all necessary steps to ensure that the plaintiff is not permitted double recovery for what are essentially two different claims for the same injury. See, e.g., Foster v. Financial Technology, Inc., 517 F.2d 1068, 1072 (9th Cir.1975).
 
 
 24
 III. LONG BEACH II --THE APPEAL FROM THE DISTRICT COURT'S
 
 
 25
 GRANT OF SUMMARY JUDGMENT FOR THE DEFENDANTS AFTER
 
 
 26
 REMOVAL FROM STATE COURT.
 
 
 27
 In February 1986, eleven years after Long Beach I began, and eight months after the summary judgment order that disposed of the last portion of the plaintiffs' case in Long Beach I, plaintiff State of California filed an action in state court naming the same defendants but alleging causes of action that arose only under state law and covered only the period between 1980 and 1985. These included: (1) unfair competition and breach of duty to the public trust; (2) breach of two contracts, the Contractor's Agreement at issue in Long Beach I and the "LBOD Agreement," a separate operating and drilling contract; (3) breach of the implied covenant of good faith and fair dealing; (4) fraud, deceit, and negligent misrepresentation; (5) three counts of improper operation of intrastate pipelines; (6) violation of state antitrust laws; and (7) violation of state trade laws based upon the other counts.
 
 
 28
 The defendants removed the action to federal court, where the plaintiffs moved to remand the action to state court. The district court remanded three claims of violations regarding intrastate pipelines to state court, and granted summary judgment in favor of defendants on five claims of unfair competition, breach of contract and good faith, and fraud, leaving two claims to go forward, one for antitrust violation of California's Cartwright Act, and a second derivative from the first, for civil penalties under California's Business and Professions Code. Plaintiffs appeal the retention of federal jurisdiction and the grant of partial summary judgment against them. They contend that all of their claims belong in the state court. We agree that the district court must remand.
 
 
 29
 Normally a suit may be removed from state court to federal court only if the action could have been filed originally in federal court. 28 U.S.C. Secs. 1331, 1441; Caterpillar, Inc. v. Williams, 482 U.S. 386, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987). Normally a plaintiff may avoid federal jurisdiction by exclusive reliance on state law. Id. However, the "artful pleading doctrine" is sometimes used to recharacterize a plaintiff's complaint when a plaintiff attempts to mischaracterize the nature of his claim as arising under state law when it is actually federal. See Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981). "[I]n many contexts plaintiff's claim may be one that is exclusively governed by federal law, so that the plaintiff necessarily is stating a federal cause of action, whether he chooses to articulate it that way or not." Sullivan v. First Affiliated Sec., Inc., 813 F.2d 1368, 1372 (9th Cir.) (quoting 14A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure Sec. 3722 at 268-75 (2d ed. 1985)), cert. denied, --- U.S. ----, 108 S.Ct. 150, 98 L.Ed.2d 106 (1987).
 
 
 30
 In Sullivan we observed that the artful pleading doctrine has been used to allow removal where a state claim was filed to circumvent the res judicata impact of a federal judgment. Id. at 1376 (discussing Moitie ). To remedy such a situation the court "can recharacterize a state claim barred by the res judicata effect of a federal judgment as an artfully pleaded federal claim." Id.; see also Salveson v. Western States Bankcard Ass'n., 731 F.2d 1423, 1427-29 (9th Cir.1984).
 
 
 31
 The district court in this case believed that such an application of the artful pleading doctrine required denial of remand of plaintiffs' claims to state court even though they did not state any federal causes of action. It saw this case as similar to Moitie because it believed its earlier dismissal of the Long Beach I claims required dismissal of the state claims on res judicata grounds, and that removal to federal court was needed to protect its earlier federal judgment. It concluded that plaintiffs' complaint was an artful attempt to recast the earlier federal antitrust claims as state claims. The court said:
 
 
 32
 It is true that [Long Beach II ] asserts no federal claim. However, as is noted above, it makes substantially the same antitrust allegation under the Cartwright Act that the plaintiffs charge under the Sherman Act in Long Beach I. Having initially cast their action in federal terms, the doctrine of artful pleading prevents the plaintiffs from starting over again with the same claim by resorting to state law in a state court. See [Federated] Department Stores, Inc. v. Moitie, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2 (1981).
 
 
 33
 The district court's resort to the artful pleading doctrine raises two problems. First, it is unclear whether the prior federal judgment in this case actually would have operated as a res judicata bar to the state law claims being brought. A judgment covering an earlier time period need not necessarily operate as a res judicata bar to a lawsuit covering a later period even though both suits involve essentially the same course of wrongful conduct. Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Simply alleging the same type of claims against the same defendants for a later period does not guarantee a res judicata bar, because factual matters, such as the conduct of the parties since the first judgment, must be considered.[6] See id. at 328, 75 S.Ct. at 868; see also Eichman v. Fotomat Corp., 759 F.2d 1434, 1438-39 (9th Cir.1985) (discussing res judicata doctrine under California law).
 
 
 34
 Second, our reversal today of the Long Beach I judgments undercuts the basis for applying the doctrine. We held in Sullivan that the existence of ongoing parallel state and federal suits does not permit removal of the state case under the artful pleading doctrine. There we refused to apply the doctrine and ordered remand of state law claims to state court where parallel lawsuits of state law claims in state court and federal claims in federal court were simultaneously ongoing. We narrowly construed Moitie as permitting removal under the doctrine only of "state claims precluded by the res judicata effect of a federal judgment." Sullivan, 813 F.2d at 1376. This is a similar situation.
 
 
 35
 No res judicata preclusion of state law claims occurred in Sullivan because the federal action had not yet gone to judgment. Without such preclusion, plaintiff's pleading of state law claims in state court, even if artful, did not "close off defendant's right to a federal forum." Moitie, 452 U.S. at 397 n. 2, 101 S.Ct. at 2427 n. 2 (quoting 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3722 at 564-66 (1976)). To allow this type of removal except where a final federal judgment wholly precludes the state court suit would violate "the paramount policies embodied in the well-pleaded complaint rule--that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court." Caterpillar, 107 S.Ct. at 2433.
 
 
 36
 Our action today renders this case squarely within the rule of Sullivan. There is no res judicata preclusion arising from the judgment on the Long Beach I claims, because we have in this and the accompanying opinion reversed the district court's summary judgment orders on all claims in Long Beach I. Our reversal removes any basis for federal court jurisdiction under the artful pleading doctrine. We therefore reverse the district court's entry of judgment and remand in order for the district court, in turn, to remand the removed claims to the state court. The state court is competent to deal with this situation, even if the federal case goes to judgment:
 
 
 37
 The res judicata impact of a federal judgment is a question of federal law which a state court is bound to apply under the Supremacy Clause. The state court is competent to apply federal res judicata in the state law suit, and res judicata would be interposed as a defense which ordinarily would not support removal.
 
 
 38
 Sullivan, 813 F.2d at 1376 (citations omitted). Any issues concerning the priority of the litigation, possible preclusion of issues, and the manner in which the state court action should proceed in relation to the ongoing federal court action in Long Beach I, should be considered by the state court.
 
 
 39
 The judgments are REVERSED AND REMANDED for further action consistent with this opinion.
 
 
 
 [1]
 Aside from the other opinion today, this case has also spawned the jurisdictional decisions of the Temporary Emergency Court of Appeals in In re Coordinated Pre-Trial Proceedings in Petroleum Products Antitrust Litigation, 761 F.2d 710 (Em.App.1985) and Petroleum Products Antitrust Litigation, 830 F.2d 198 (Em.App.), cert. denied, --- U.S. ----, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987). A breach of contract claim continues in the District Court for the Central District of California as case No. CV-86-1771-WPG. Certain state law claims continue in litigation in California state court as case No. C587912 (L.A.County Super.Ct.)
 
 
 [2]
 Original Defendants Chevron, Arco, Texaco, Unocal, Mobil, Shell, and Exxon all signed the original agreement. Arco has settled with the plaintiffs, and is not a party here
 
 
 [3]
 Pauley Petroleum, Inc. and Allied Chemical Corp. were signatories to the contract but were never named as defendants
 
 
 [4]
 The "Field" referred to is the Wilmington field itself
 
 
 [5]
 The "Named Fields" referred to are the Wilmington field and three other nearby oil fields in Southern California, Huntington Beach, Inglewood, and Signal Hill
 
 
 [6]
 We note that the trial court believed that the two claims were factually identical. Due to our holding, we need not and do not express an opinion on the res judicata effects of the earlier federal judgment