CITY OF VERNON, Plaintiff–Appellant,

v.

SOUTHERN CALIFORNIA EDISON COMPANY, Defendant–Appellee.

No. 90–56281.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 1991.

Decided Feb. 7, 1992.

rate schedules, and by engaging in a group boycott that prevented Vernon from obtaining bulk power from other suppliers. Vernon sought damages and injunctive relief on each of its claims. The district court granted summary judgment in favor of Edison. Vernon appeals. We affirm in part and reverse in part.

## BACKGROUND

Edison is an investor-owned fully integrated public utility, which generates, transmits, and distributes electric power within its service area, an area which includes much of Central and Southern California. Vernon is located in Edison's service area, but it has its own electric distribution system, and is the sole provider of retail electric service within its own boundaries. Vernon is bounded by Edison territory and by the City of Los Angeles, which also has its own service territory operated by the Los Angeles Department of Water and Power.

Although Vernon distributes power at retail within its boundaries, it generates a very small portion of its own electricity. Thus, it obtains most of its power in bulk elsewhere and receives it over Edison's transmission lines. That wholesale power is purchased from Edison or from other electrical utilities. It is Edison's responsibility to see to it that Vernon receives all of the power that it needs. Edison also purchases power from and sells it to other utilities.

Vernon and Edison have a long history of disputes over rates, access to Edison's transmission facilities, and the integration of non-Edison power sources into Edison's operating system for the benefit of Vernon.[1] Most of Edison's conduct with respect to Vernon is regulated by the Federal Energy Regulatory Commission (FERC), including the wholesale rates Edison charges, the terms of integration agree-

Shirley M. Hufstedler, Hufstedler, Kaus & Ettinger, Joseph J. O'Malley, Paul, Hastings, Janofsky, & Walker, Los Angeles, Cal., David C. Hjelmfelt, Channing D. Strother, Jr., Goldberg, Fieldman & Letham, P.C., Washington, D.C., for plaintiff-appellant.

Paul G. Bower, Arthur L. Sherwood, Richard D. Hall, Daniel G. Swanson, and Suzanne S. La Pierre, Gibson, Dunn & Crutcher, Los Angeles, Cal.; and David N. Barry III, Stephen E. Pickett, and Janet K. Lohmann, Southern California Edison Company, Rosemead, Cal., for defendant-appellee.

Before SCHROEDER, LEAVY and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

The City of Vernon ("Vernon") brought this action against Southern California Edison Company ("Edison") and alleged that Edison had engaged in anticompetitive conduct by denying Vernon access to power transmission lines, by filing discriminatory

1. Integration of non-Edison power sources requires Edison to transmit power obtained from other sources while giving credit to the wholesale customer which obtained the outside power capacity credit because Edison need not maintain as much power generation capacity if power can be imported.

ments, and transmission rights on Edison's high voltage lines.[2]

Vernon's denial of access claims (sometimes called foreclosure claims) are based upon Edison's refusal to provide relative size share[3] access to its transmission lines, particularly the Pacific Intertie[4] and lines from the desert Southwest. Vernon also claims entitlement to what the district court characterized as "unlimited" access to Edison's 220 kV network.[5]

Vernon claims that Edison has refused to enter into reasonable agreements to integrate Vernon's firm purchases from other sources. These claims involve a generic Integrated Operations Agreement (IOA) and Special Condition 12 (SC–12). The IOA which Edison submitted to Vernon provided that outside power resources could be integrated into Edison's service system on such terms and at such time as Edison deemed appropriate. The FERC determined that parts of the IOA, including the absence of a reasonable notice provision, were unreasonable. *Southern Cal. Edison Co.*, 41 F.E.R.C. ¶ 61,188 at 61,493–94 (1987) and *Southern Cal. Edison Co.*, 52 F.E.R.C. ¶ 61,299 at 62,202–03 (1990), *vacated in part*, 55 F.E.R.C. ¶ 61,258 (1991). SC–12 was entered into as a partial settlement of Vernon's claims that Edison was unreasonably denying integration and access. SC–12 permits Vernon to import and obtain capacity credit for outside resources without integration pursuant to an IOA.

Vernon also asserts that Edison acted anticompetitively in interrupting or refusing transmission from Nevada Power Company (Nevada Power) to Vernon. It also claims that Edison and Nevada Power engaged in a group boycott designed to keep Vernon from purchasing power from Nevada Power. Vernon and Edison entered into a contract for interruptible transmission service under which Vernon could purchase power from outside suppliers on a non-firm basis. That power would then be transmitted over Edison lines. The contract provided for interruption by Edison at any time and for any reason.

The parties brought several motions for summary judgment, including those which ultimately resulted in judgment for Edison on all claims. The district court granted summary judgment on the foreclosure claims on several grounds. As to Vernon's claim that it was entitled to relative size share access, the district court determined that Edison had established a legitimate business reason for its refusal to provide the requested access, which Vernon had failed to refute. Summary judgment on the integration claims was granted on the ground that Edison had shown a legitimate business justification for not providing for integration on eighteen months' notice. The court granted summary judgment on the SC–12 claims because Edison had no obligation to offer SC–12 and its failure to offer it sooner was not an antitrust violation. The court granted summary judgment on the interruptible transmission service claims because Vernon had not quantified damages. The court viewed that claim as arising from a contractual dispute, and found no material issue of fact regarding

2. The FERC regulates Edison's conduct pursuant to the Federal Power Act. 16 U.S.C. § 824.

3. "Relative size share" simply refers to Vernon's theory that if it uses, for example, 1.5% of the electricity transmitted into the Edison territory then it should receive 1.5% of the firm transmission access to the EHV (Extra High Voltage) transmission lines. While Vernon's damage study based damages on an assumption that it was entitled to relative size share access, Vernon claims that it should receive a "fair share" and Edison has failed to propose any other way of calculating Vernon's fair share.

4. The Pacific Intertie is a group of high-power transmission lines which bring hydroelectric power to Edison's control area from the Pacific Northwest. Edison shares ownership in the Pacific Intertie with several other utilities, so that it is entitled to only a portion of the lines' total capacity. The lines consist of two 500 kV AC lines, and one 800 kV DC line.

5. The 220 kV network is the local transmission net work through which Edison transmits energy directly to its retail and wholesale customers. Vernon's claim is that its access should be unlimited unless there is insufficient capacity to meet the total demand. In that case, Vernon contends that "the constraint on the system should be shared."

whether Edison's reasons for interrupting were legitimate.

The district court also granted Edison's motion for summary judgment on its claims that Edison had discriminated against Vernon in its rates[6] and on the claim that Edison and Nevada Power engaged in a group boycott against Vernon. The court concluded that summary judgment was appropriate because Vernon had presented no evidence of damages and Vernon had failed to introduce evidence sufficient to sustain a finding of concerted action. Eventually, the court determined that judgment was appropriate on all of Vernon's claims, including a claim that Edison had conspired with others to deny access to the Pacific Intertie. Vernon asked the district court to compel Edison to bring a motion for summary judgment on the latter claim, but the district court declined to require the filing of a separate motion.

After entry of judgment, Vernon filed a timely motion for reconsideration. The district court declined to reconsider its decision.[7] Vernon filed a timely notice of appeal.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 15 U.S.C. §§ 15 and 26. We have jurisdiction under 28 U.S.C. § 1291.

■ We review a grant of summary judgment de novo. *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 614 (9th Cir.1990), *cert. granted,* — U.S. ——, 111 S.Ct. 2823, 115 L.Ed.2d 994 (1991). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

Summary judgment is appropriate if the nonmoving party bears the ultimate burden of proof at trial as to an element essential to its case, and fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## DISCUSSION

■ To establish a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (§ 2), Vernon would have to show (1) that Edison possessed monopoly power in the relevant market; (2) that it willfully acquired or maintained that power; and (3) that Vernon suffered a causal antitrust injury. *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 363 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). An attempt to monopolize is also actionable under § 2. Attempted monopolization has three elements: "specific intent to monopolize, predatory or anticompetitive conduct, and a dangerous probability of success." *Drinkwine v. Federated Publications, Inc.,* 780 F.2d 735, 740 (9th Cir. 1985), *cert. denied,* 475 U.S. 1087, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). Vernon would also be required to show causal antitrust injury in an attempted monopoly case. *California Computer Products, Inc. v. IBM Corp.,* 613 F.2d 727, 736 (9th Cir. 1979).

■ To establish a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (§ 1), Vernon would have to prove "three elements: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually restrains competition." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1488 (9th Cir.1991) (citation and quotations omitted).

---

**6.** Vernon has not appealed the district court's grant of summary judgment on its rate claim.

**7.** Though Vernon appealed from the denial of its motion for reconsideration, it presented no argument on appeal that the district court

abused its discretion in denying the motion. In any event, we find no abuse of discretion because Vernon should have been able to present evidence of pretext, if any, at the original summary judgment hearings.

### A. *Essential Facility Claims.*

Vernon's foreclosure claims are based on its assertion that the EHV transmission lines, such as the Pacific Intertie and the Southwest lines, as well as the 220 kV grid, are essential facilities to which Edison has improperly refused Vernon access. In our opinion in the companion to this case, *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, (9th Cir.1991), filed on the same date as this opinion, we have outlined the nature of the essential facility doctrine and the elements necessary to prove liability for the refusal to allow use of an essential facility. *Id.* at 1379–81. *See also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542–44 (9th Cir.1991). Of course, that same law applies here.

However, in this case the district court assumed for purposes of the summary judgment motion "that there was competition between Edison and Vernon, that Edison had monopoly power in a properly defined market, and that Edison's transmission lines are essential facilities." Therefore, we will only determine whether given those assumptions Edison has committed an antitrust violation by refusing to give all of the access to the facilities that Vernon desires.[8]

### 1. *Relative Size Share Access.*

■ The district court determined that there were no genuine issues of material fact with respect to Edison's claim that it had a legitimate business justification for refusing relative size share access. Vernon asserted that Edison's business justification was insufficient as a matter of law, but also asserted that the alleged justification was untrue. However, as noted by the district court, Vernon did not point to any facts in opposition to Edison's motion for summary judgment which would create a material issue of fact. Instead, Vernon argued that if the asserted justification

was not insufficient as a matter of law, a jury should be permitted to decide whether a slight increase in retail prices to Edison's customers was a legitimate business reason for Edison's refusal to grant relative size share transmission access.

At the time of the summary judgment motion, Vernon did not appear to dispute the fact that retail customers would pay increased rates if it received the access sought—indeed, Vernon's damage study reflected that fact. Nor did Vernon appear to dispute the fact that Edison was legitimately concerned about the retail rates in making its facilities access decisions.[9]

The district court did not err in granting summary judgment against Vernon on the relative size share access claim. Although the defendant generally has the burden of coming forward with a legitimate business justification after the plaintiff has shown evidence of monopolistic intent, the plaintiff, in this case Vernon, ultimately has the burden of proving that the defendant acted without a legitimate business justification. *Image Technical,* 903 F.2d at 620 n. 9; *Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1339 (9th Cir.1983). *Cf. Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608–611, 105 S.Ct. 2847, 2860–61, 86 L.Ed.2d 467 (1985) (implying that defendant has burden of production and proof). In order to survive summary judgment, Vernon had to point to evidence demonstrating that there was a genuine issue of material fact as to whether Edison in fact acted on the asserted grounds. Having failed to do so, summary judgment was appropriate. Furthermore, Vernon fails to demonstrate just why Edison is required to cease using its own facility so that Vernon can begin using it. This is not a situation where Edison had no use for the facility and arbitrarily denied someone else its use. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1133 (7th Cir.) (AT & T was

---

**8.** We note that the district court granted summary judgment on at least some of the claims because Vernon failed to offer sufficient proof of damages from alleged misconduct. We will address the damages issue in Part C of this opinion.

**9.** It is legitimate for Edison to refuse access that will affect its rates to the detriment of its customers. *See City of Anaheim,* at 1381.

not asked to abandon its facilities; no business reason shown for refusal), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Nor is it a case where Edison simply refused to supply Vernon with its power needs. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 378, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973). In fine, Edison clearly had a use for its lines. As we pointed out in *City of Anaheim*, at 1380–81, the demand that Edison turn over its facility to a city simply because the city could save money by obtaining cheaper power stands the essential facility doctrine on its head.

But, even had Vernon offered some evidence which raised a material issue of fact with respect to Edison's reasons for refusing relative size share access, we can find no authority—and Vernon has pointed to none—which supports Vernon's theory that "reasonable" access to Edison's facilities must take the form of relative size share access. Even more to the point, Vernon admits that it never requested relative size share access to Edison's transmission facilities. The district court properly granted summary judgment.

### 2. *Integrated Operations Agreement.*

■ The IOA was one way in which Edison could meet its obligation to provide reasonable access to its essential facilities. The district court held that to the extent that Edison had a duty to integrate Vernon's power purchases, the duty was limited by legitimate business justifications. The court found no triable issue of fact on this claim and determined that summary judgment was appropriate because Edison had a legitimate business justification for not providing for an eighteen month notice period [10] when the FERC had determined that a three year period was reasonable.

Assuming, as the district court did, that Edison is a monopolist in control of an essential facility, it must not unreasonably deny access to the facility to its competitors. *MCI*, 708 F.2d at 1132. Given that predicate, we conclude that Edison had a duty to integrate purchases of outside resources upon reasonable notice. Despite the assumptions made in Vernon's damage study, Vernon's complaint is not that Edison refused to allow integration on 18 months' notice, but that Edison refused to allow integration until it felt like it. The IOA proposed by Edison did not contain a particular notice period—integration occurred at Edison's discretion.[11] The FERC determined that Edison's discretionary standard was unreasonable, and that a three year period was reasonable notice. *Southern Cal. Edison Co.*, 41 F.E.R.C. at 61,493–94; *Southern Cal. Edison Co.*, 52 F.E.R.C. at 62,202–03.[12]

Edison offered no legitimate business reason for its refusal to provide a reasonable notice period. Rather, in support of its motion for summary judgment, it simply asserted that it had no duty under the antitrust laws to provide integration on reasonable notice. We find little merit in that contention. In any event, it seems unlikely that Edison could have prevailed on a claim that it had a legitimate business reason for refusing to establish a reasonable notice period. The integration agreement provided benefits not only to the municipal utility, but to Edison as well. Edison would be able to avoid adding additional generating capacity and it also received a portion of the integrated electricity as reserves. The municipality would be able to lower its costs. Thus, in refusing to provide for a reasonable notice period, Edison was foregoing a benefit to itself and its

---

**10.** The 18 month period versus three year period engendered confusion because Vernon's damage study was based on the 18 month notice period provided in Special Condition 12.

**11.** As characterized by the FERC, the IOA would have permitted Edison to "subordinate a completed city project [desired to be integrated] to an Edison project that may still be in the early stages of development or which may be de-

ferred or never completed." *Southern Cal. Edison Co.*, 41 F.E.R.C. at 61,494.

**12.** The district court did not determine what notice requirement would be reasonable, but concluded that no liability could be imposed for refusal to adopt a notice period of less than three years. Vernon asserted before the FERC that a three year period was reasonable and the FERC agreed.

ratepayers. *Cf. Aspen Skiing,* 472 U.S. at 608, 105 S.Ct. at 2860. A trier of fact might well conclude that Edison had no legitimate business reason for refusing to enter into a reasonable IOA.

In other words, based upon all of the assumptions that the district court made for summary judgment purposes, it is possible that a trier of fact would find that Edison's IOA position could have been an attempt to use monopoly power to eliminate competition. Had the determination of the district court been made at the end of a trial, there would not be error; summary judgment is another matter entirely.[13]

### 3. *Special Condition 12 Claim.*

◼ The district court found that Edison had no obligation under the antitrust laws to offer SC–12 to Vernon, particularly where Edison could reasonably require three years notice for integration of capacity resources. Even though Edison had a duty to integrate capacity resources on reasonable notice, there is nothing to suggest that Edison was required to do so through SC–12. In addition, it appears that there are no damages attributable to Edison's failure to implement SC–12 sooner which are separable from Edison's failure to provide for integration on reasonable terms. As Vernon contends that SC–12 was only a partial correction of the defects in the IOA, there would appear to be no additional losses from any delay or limitation in SC–12 over and above the losses allegedly caused by the improper IOA. Summary judgment on this claim was appropriate.

### 4. *Interruptible Transmission Service.*

◼ The district court concluded that three grounds supported summary judgment on Vernon's claims that Edison improperly denied, interrupted or curtailed Interruptible Transmission Service (ITS) from Nevada Power to Vernon. First, the court concluded that Vernon had failed to quantify any damages from the interruptions.[14] Second, the court concluded that

an antitrust claim could not be based on a "contractual dispute as to the reasonableness of conduct." Finally, the court concluded that Vernon had failed to demonstrate that Edison's reasons for interrupting transmission were not legitimate.

◼ We are not convinced that antitrust liability may not be predicated on conduct which also happens to create a contract dispute. It is certainly true that a claimed breach of contract by unreasonable conduct, standing alone, should not give rise to antitrust liability. But in this case, Vernon is not simply claiming that Edison breached its contract. Instead, Vernon is claiming that by preventing the purchase of electricity from Nevada Power, Edison acted anticompetitively and without a legitimate business reason. The fact that Vernon and Edison have a contract allowing Edison to interrupt transmission "for any reason" is beside the point. The contractual right to interrupt service does not grant Edison the freedom to act anticompetitively. *See California v. Chevron Corp.,* 872 F.2d 1410, 1414 (9th Cir.1989) (discussing pendent state law claims to antitrust case), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). *See also City of Long Beach v. Standard Oil,* 872 F.2d 1401 (9th Cir.1989) (discussing antitrust claims in action related to *California v. Chevron* ), *amended,* 886 F.2d 246, *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). In short, Edison might avoid contractual liability through the interruption provision, although even that is questionable, *California v. Chevron Corp.,* 872 F.2d at 1414, but the contractual limitation does not speak to antitrust concerns.

That, however, does not itself demonstrate that summary judgment was inappropriate. At first blush, Vernon's evidence seems to raise an issue of fact as to whether Edison's asserted business justifications for interrupting transmission were legitimate. There was some evidence from which a trier of fact could conclude that

---

**13.** However, see the damage discussion in Part C of this opinion.

**14.** See our discussion of damages in Part C of this opinion.

Vernon encountered refusals to provide transmission even when Edison had capacity available.

Nonetheless, summary judgment was appropriate on this claim. It is not enough for a party to content itself once it has produced a mere scintilla of evidence to support its case. Rather, as the Supreme Court held in *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the record must be sufficient to "lead a rational trier of fact to find for the non-moving party...." That requirement was underscored in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) where the Court held that the evidence must have sufficient strength to allow a reasonable jury to "return a verdict for the nonmoving party." Here the evidence does not reach that level.

Vernon's evidence consists of an entry in a Nevada Power log that indicates that on one occasion there was a refusal to allow transmission if Nevada Power was "purchasing [power] from the east," and a sworn statement and a deposition from a single former Nevada Power dispatcher, Richard Greenwalt.

Greenwalt's testimony was to the effect that there was on occasion a refusal to allow transmission which prevented Nevada Power from making a sale to Vernon. He indicated that some possibly improper statements were made to him "reasonably often" or were "very common." His exact meaning is not clear. More than that, he gave absolutely no specifics as to person or as to time. Detail of a kind that would allow evaluation of the accuracy of his recall or of the consistency and extent of the acts is missing. Certainly, there was no evidence that transmission was interrupted at any time at the behest of any person employed by Edison other than a dispatcher, who was acting as he did for unknown reasons. There was no evidence that any person with management or supervisory authority ever told any dispatchers to interrupt or to refuse transmissions for any anticompetitive reason or that dis-

patchers were acting on a policy of wrongfully refusing or interrupting transmission. There was no evidence produced to show that any management level personnel ever approved or ratified wrongful transmission interruptions or refusals.

It is important to remember that this is not a simple tort case where a single incident is enough to support liability. The claim in this case is that there was relatively long-term activity aimed at crushing a competitor. If proved, antitrust liability and treble damages would be imposed upon Edison. Yet, Vernon proposed to proceed with this complex antitrust case based upon evidence which almost entirely consisted of statement from a former Nevada Power employee operating at a fairly low level. As already mentioned, his statements were that unknown employees of Edison, operating at a similarly low level, interrupted transmission from time to time improperly. Who did it remains unknown. When they did it remains equally unknown. There is an almost total absence of detail. Against that Edison did all one could do: it submitted numerous affidavits from Nevada Power and Edison employees who stated that they never did those things or even heard of them. Their testimony, which was uncontested and unchallenged, indicates that if the threats did occur they were neither frequent nor uniformly issued.

We agree with the district court that antitrust liability must be composed of stronger stuff. In so doing we do not mean to suggest that lower level employees cannot involve a corporation in antitrust liability. Nor do we suggest that credibility determinations should be made at the time of summary judgment.

■ As to the former, we recognize that even if an employee is violating express corporate policy, the corporation might still be held responsible. As long as the employee is acting within the scope of his employment, imposition of liability upon the corporation is appropriate. *See United States v. Portac, Inc.*, 869 F.2d 1288, 1293 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990); *Unit-*

*ed States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004–07 (9th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973). *See also American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Nevertheless, we do not believe that the employee's position within the organization can be entirely ignored when we are attempting to determine whether antitrust activity was afoot at all. For example, in each of the cases just cited a conspiracy to act for anticompetitive reasons was clearly present and the employee involved wielded a good deal of authority. In *Hilton Hotels* there was a full blown conspiracy and the employee in question was *the* purchasing agent for the hotel in question. 467 F.2d at 1004. In *Portac*, also, there clearly was a conspiracy and, again, the employee involved was the sole purchasing agent for the defendant. 869 F.2d at 1293. Finally, in *American Society of Mechanical Engineers* there was a clear conspiracy to violate the antitrust laws. One of the participants was the chairman of the subcommittee that issued a letter designed to carry out the anticompetitive intentions. 456 U.S. at 560–62, 102 S.Ct. at 1939–40. The letter was then signed by the secretary of the committee itself, and carried great weight in the engineering industry. *Id.* at 561–64, 102 S.Ct. at 1940–41. In the case at hand, however, the most Vernon has shown is that one or more unidentified members of an amorphous group of Edison dispatchers occasionally unnecessarily interrupted power transmissions for largely unexplained reasons, some of which may have been improper. They did so while pursuing a myriad of transactions conducted over a long period.

▮ Nor need we or should we evaluate credibility at summary judgment. *See McLaughlin v. Liu*, 849 F.2d 1205, 1207

(9th Cir.1988). Nevertheless, the testimony of Mr. Greenwalt, even if accepted, would not be sufficient to allow a rational trier of fact to impose antitrust liability on Edison. The question here is not simply whether Edison can be held liable for the proven antitrust violations of employees acting with apparent authority, *see Hilton Hotels*, 467 F.2d at 1004 and *Portac*, 869 F.2d at 1293, but whether a rational jury could conclude that there were antitrust violations in the first place. In evaluating that question, the fact that Mr. Greenwalt could not recall any names, dates or times further indicates that Vernon has not raised a factual dispute sufficient to survive summary judgment.

In sum, more evidence than that produced by Vernon would be needed to impose liability upon Edison on this claim. The district court did not err when it granted summary judgment.

### 5. *The Pacific Intertie.*

Vernon asserted that Edison violated § 1 by conspiring with others to prevent Vernon from obtaining access to the Pacific Intertie.[15] We recognize that in Vernon's § 1 claim with respect to the Pacific Intertie, Edison, not Vernon, would have the burden of proving that it had a legitimate business purpose for foreclosing access. *Image Technical*, 903 F.2d at 618 n. 5. However, a review of the record does not reveal *any* evidence adduced by Vernon that Edison conspired with anyone to deny access to the Pacific Intertie. A § 1 violation requires "concerted action" by more than one entity. *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir.1988).[16] The district court properly granted judgment on this claim.

### B. *Edison–Nevada Power Boycott Claims.*

To prevail on a claim under § 1, Vernon would have been required to show concert-

---

**15.** While Edison contends that Vernon abandoned its Pacific Intertie claims, it is clear from the record that Vernon did not do so. We find no error in the district court's entry of judgment on this claim without a formal motion for summary judgment, since Vernon acceded to the entry of judgment on this claim.

**16.** Vernon also conceded that it had not segregated damages on the Pacific Intertie claims. See our discussion of damages in Part C of this opinion.

ed action on the part of Edison and Nevada Power. *The Jeanery,* 849 F.2d at 1152. The district court granted summary judgment on the horizontal boycott claims on the grounds that Vernon had failed to show evidence of damages from the alleged boycott and because Vernon had failed to offer evidence of concerted action.

■ We agree with Vernon that a conspiracy to monopolize may exist even where one of the conspirators participates involuntarily or under coercion. *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 682 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). To survive summary judgment, a plaintiff must point to evidence " 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted); *Morgan, Strand,* 924 F.2d at 1488. Edison makes much of this language and suggests that Vernon's evidence does not exclude the possibility of independent action. But *Matsushita* does not extend quite as far as Edison suggests. Following its "exclude the possibility" language, the Court stated that the nonmoving party, "in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" it. *Id.,* 475 U.S. at 588, 106 S.Ct. at 1356–57. Nevertheless, Vernon did not even meet this somewhat lesser standard.

Here, too, Vernon's evidence was far too weak. First, there is no evidence that the alleged acts by the unnamed Edison dispatchers were more than random, unauthorized acts by employees. There was no showing, in other words, that these Edison dispatchers entered into conspiracies with Nevada Power dispatchers to boycott Vernon's attempt to purchase power. Second, if Edison refused to transmit Nevada Power's electricity over Edison lines, Nevada Power had no choice but to acquiesce. That does not make it a conspirator. Third, as the district court noted, it would be most difficult to draw a reasonable in-

ference of conspiracy where there was no meeting of the minds. Instead, according to Vernon's evidence, Edison had to continually threaten Nevada Power dispatchers and they did not necessarily accede to those threats. The district court did not err.

### C. *Damages.*

■ Vernon presented the court with a damage study which was, at best, seriously flawed. That resulted in findings that because no damages had been properly shown, there was an independent reason to grant summary judgment on various claims against Edison. Vernon asserts that the district court erred. We do not agree. Indeed, the deficiencies in that study undermine Vernon's whole case.

The principles which the courts follow in deciding this issue are well described in *MCI.* There the court reviewed a damage verdict and in so doing made the following observations:

> Once *causation* of damages has been established, the *amount* of damages may be determined by a just and reasonable estimate as long as the jury verdict is not the product of speculation or guess work. Since the Supreme Court has been willing to accept a degree of uncertainty in the calculation of damages, strict proof of what damages have been caused by which acts has not been required. Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another.
>
> . . . .
>
> The courts have always distinguished between proof of *causation* of damages and proof of the *amount* of damages. Thus, the courts have been consistent in requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant.

708 F.2d at 1161 (citations omitted).

The court continued as follows at page 1163:

There is nothing inconsistent between requiring *proof that damages were caused by illegal acts* and the rule that a plaintiff need not disaggregate damages among those acts found to be unlawful. In this case, the trial court granted summary judgment for AT & T on seven of the twenty-two counts in the complaint. In addition, the jury found for AT & T on five of the fifteen counts it considered. The jury found for MCI on two counts relating to Hi–Lo tariffs, two counts relating to the tariffs filed with state agencies, and six counts relating to interconnection. In addition, this court has now determined that the jury's findings for MCI on the pricing and pre-announcement of Hi–Lo as well as the finding relating to denial of multipoint interconnections must be set aside.

MCI assumed in the preparation of its damage study that all twenty-two of AT & T's acts charged were illegal. In fact, liability has now been established with respect to only seven of the twenty-two counts of alleged monopolization. MCI's lost profits study does not establish any variation in the outcome depending on which acts of AT & T were held to be legal and which illegal.

The result was a remand for a new trial on the damage issue. We accepted that view in *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir.1985) (footnote omitted), where we, too, declared that the plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate requires reversal of the verdict and remand for a new trial on the amount of damages." *Cf. William Inglis & Sons Baking Co. v. Continental Baking Co., Inc.*, 942 F.2d 1332, 1341 (9th Cir.1991) (where lost profits calculation was wholly speculative, the district court should have granted judgment notwithstanding the verdict).

Here, of course, the matter came up before trial commenced and at a time when the only possibly admissible damage study was before the court. That study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were. Nor did Vernon attempt or offer to make corrections. Rather, according to its own expert Stephen Flanagan, speaking in the context of the group boycott claim, Vernon would not or could not do so. That might well have been because Vernon's deeply flawed study is the handmaiden of its equally flawed theory that it should have proportionate firm access to Edison's whole system at all times.

The question remaining is whether the district court was nevertheless required to allow Vernon to go to the jury with its erroneous approach or to give it still another opportunity to refine a study that, according to Vernon, could not be refined. We think not.

We dealt with a similar situation in *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir.1988). There the damage studies of the plaintiffs were plainly insufficient, so the district court excluded them. We held that the absence of a proper study meant that the plaintiffs "could make no showing about the amount of damages." *Id.* at 808. As a result, there was no "competent evidence from which a jury could fairly estimate damages," *id.* at 808, and summary judgment was proper. *See also ILC Peripherals Leasing Corp. v. International Business Mach. Corp.*, 458 F.Supp. 423, 434 (N.D.Cal.1978) (summary judgment granted where the damage study did not separate effects of various acts so that "there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful.")

In *McGlinchy*, we cited our earlier case of *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506 (9th Cir. 1985), a case in which the damage study presented at the time of summary judgment was also flawed. There, however, the flaws did not appear to be insurmountable and we opined that "Dolphin has presented evidence from which a jury could reasonably estimate the amount of Dolphin's injury without speculation if Dol-

phin's damage evidence were filled in by testimony at trial." *Id.* at 1513. We had confidence in that possibility because it appeared that the data already existed even though it had not yet been placed in the proposed damage report. Moreover, we said, if the repair was not made the district court could grant a directed verdict or a judgment notwithstanding the verdict.

Here we have no such confidence. Vernon insists that all of Edison's acts contributed to the damage figure, but the district court and we have already found that many of those acts were proper. It might be argued that since Vernon had a contract with Nevada Power which was to save Vernon $80,000 per month and did not, there was at least a loss of that amount, damage studies notwithstanding. However, that argument would suffer from the same flaw because there is no indication of what part of that $80,000 loss of savings was due to proper interruptions of service and what part to improper ones, or for that matter, due to other factors entirely.

In short, we agree with the district court that the serious flaws in the only damage study which could be proffered to the jury placed Vernon in the position of having no proper proof of damages at all. Thus, the district court did not err when it awarded summary judgment based upon this lack of evidence.

### D. *Injunctive Relief.*

Injunctive relief might be appropriate if Edison has unreasonably refused access to its essential facilities. *Otter Tail Power Co.*, 410 U.S. at 381–82, 93 S.Ct. at 1031–32. The court did not grant any injunctive relief because it concluded that Edison had not violated the antitrust laws. However, summary judgment on Vernon's claim that Edison's refusal to provide for a reasonable notice term in the IOA was proper only because Vernon failed to quantify damages which resulted from that conduct. Thus, it is possible that Vernon will be entitled to injunctive relief if it can prove an antitrust violation. We therefore must reverse the denial of injunctive relief as to the IOA

claim only and remand the case to the district court to determine the propriety of injunctive relief.

### CONCLUSION

Here, as in *City of Anaheim*, at 1373, we need only decide whether the actions of Edison violated the antitrust laws. The district judge held that Edison did not violate those laws, and, even if it did, Vernon did not properly delineate damages. For the most part we agree.

Therefore, we affirm the district court in every respect save one. That one is: the district court erred in granting summary judgment on Vernon's claim for injunctive relief arising out of Edison's refusal to develop reasonable terms for integrated operations agreements.[17]

AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS. The parties shall bear their own costs on appeal.

---

17. We deny Edison's motion to strike portions of Vernon's brief and excerpts.